

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-3-2008

# USA v. Hardwick

Precedential or Non-Precedential: Precedential

Docket No. 06-2541

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Hardwick" (2008). *2008 Decisions.* Paper 286.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/286

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 06-2541, 06-2571, 06-3061, and 06-5151

UNITED STATES OF AMERICA

vs.

LORENZO HARDWICK, a/k/a "Fu Quan,"
                    Appellant in No. 06-2541,

_____

UNITED STATES OF AMERICA

vs.

JOSE G. RODRIGUEZ,
                    Appellant in No. 06-2571,

_____

UNITED STATES OF AMERICA

vs.

BERNARD MURRAY, a/k/a "B-Nice,"
                    Appellant in No. 06-3061,

_____

UNITED STATES OF AMERICA

vs.

ALLEN RESTO, a/k/a "Tito Allen,"
                    Appellant in No. 06-5151.
_____

Consolidated Appeals from the United States
District Court for the District of New Jersey
(Crim. No. 02-684)
District Court Judge: Honorable Robert B. Kugler

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 23, 2008

_____

Before: BARRY, AMBRO and GARTH, Circuit Judges,
(Opinion Filed: October 3, 2008)

Christopher J. Christie, United States Attorney
George S. Leone, Chief, Appeals Division
Eric H. Jaso, Assistant United States Attorney
970 Broad Street
Newark, New Jersey 07102-2535
          Counsel for Appellee

Jerome A. Ballarotto
143 Whitehorse Avenue
Trenton, New Jersey 08610
        Counsel for Appellant Lorenzo Hardwick

Catherine M. Brown
60 Washington Street
P.O. Box 9058
Morristown, New Jersey 07963-9058
        Counsel for Appellant Jose G. Rodriguez

Michael E. Riley
Law Offices of Michael E. Riley, LLC
The Washington House
100 High Street, Suite 103
Mount Holly, New Jersey 08060
        Counsel for Appellant Bernard Murray

Brian S. O'Malley
607 White Horse Pike
Haddon Heights, New Jersey 08035
        Counsel for Appellant Allen Resto

_____

**OPINION**
_____


GARTH, <u>Circuit Judge</u>:

-1-

The four defendants in this case filed separate appeals that were consolidated upon motion by the Government. Although the defendants raise numerous arguments on appeal, only two questions warrant discussion.[1] We address whether a

[1] Hardwick's issues on appeal were: (1) acceptance of Captain Joseph Bowen as an expert on the Sons of Malcolm X was prejudicial error; (2) the Assistant United States Attorney's vouching statements during closing argument were reversible error; (3) the late admission of pretrial statements of co-defendant Bernard Murray violated the Confrontation Clause and constitutes reversible error; (4) use of unproven, judicially found facts to enhance defendant's sentence beyond the statutory maximum found by the jury was improper and requires defendant's sentence to be vacated.

Rodriguez's issues on appeal were: (1) submission of a copy of the indictment to the jury is a structural defect in the proceedings below requiring a new trial; (2) the trial court improperly denied Jose Rodriguez's motions for severance and separate trial; (3) resentence is required because it is based upon an incorrect guidelines analysis; (4) Mr. Rodriguez joins in the merits arguments of the co-defendants.

Murray's issues on appeal were: (1) since defense counsel offered no evidence or arguments during his cross-examination of the Government witnesses contrary to the proffer agreement, the Government breached the agreement and it was error for the court to admit the defendant's proffer statements; (2) even if defense counsel inadvertently opened the door to the admission of the defendant's proffer statements, the failure of the Government to contemporaneously object constituted a

waiver in a proffer agreement that allows the Government to use a defendant's proffer statements[2] as part of its case-in-chief at trial is valid and enforceable. We also consider whether

---

waiver and the statements should not have been admitted; (3) acceptance of Captain Joseph Bowen as expert on the Sons of Malcolm X was prejudicial error; (4) prosecutor's vouching statements during closing argument was reversible error.

Resto's issues on appeal were: (1) acceptance of Captain Joseph Bowen as an expert on the Sons of Malcolm X was prejudicial error; (2) the court erred in permitting 404(b) evidence regarding an alleged golf clubbing of an individual by defendant Resto; (3) admission of the two incriminating proffer statements of co-defendant Bernard Murray was constitutional error requiring a new trial; (4) admission of the Murray statements coupled with a failure to sever Allen Resto deprived him of his constitutional right to confront this adverse witness against him and, further, bolstered testimony of numerous other witnesses previously presented at trial who were not cross-examined based upon the Murray statements; (5) prosecutor's vouching statements during closing argument were reversible error; (6) submission of a copy of the indictment to the jury is a structural defect in the proceedings below requiring a new trial; (7) Allen Resto was denied effective assistance of counsel in this trial, and this denial coupled with other trial error deprived him of due process requiring a new trial.

[2] See Appendix A to this opinion where Murray's redacted proffer statements are reproduced as they were read into the trial record.

-3-

admission of that proffer statement violated the Confrontation Clause rights of other defendants who were implicated in that proffer statement. As discussed below, we find no reversible error and affirm all four convictions.

**I.**

This case involves various criminal acts related to drug dealings in Camden, New Jersey. Without delving into the details of each criminal act, it is enough to know that this case concerns a gang called the Perez Organization. From January 1998 to September 2002, this gang was led by Enrique "Ricky" Perez, a cooperating witness, and defendants Bernard "B-Nice" Murray and Allen "Tito Allen" Resto. Defendant Lorenzo "Fu Quan" Hardwick managed one of the drug corners (or "sets") controlled by the Perez Organization, and defendant Jose G. Rodriguez was one of the primary "baggers" for the gang, responsible for processing the drugs into individual bags for street sale. Various disputes erupted between members of the Perez Organization and competing drug dealers. Three individuals were shot to death, and several others were badly injured.

On February 22, 2005, a federal grand jury in Camden, New Jersey, issued an eight count Superseding Indictment naming Murray, Resto, Hardwick, and Rodriguez as defendants.[3] The charges in the indictment included conspiracy

---

[3] The Superseding Indictment also named Ramon "Flaco" Saldana as a defendant. Saldana pled guilty to Count One—the only count in which he was named—on March 21,

to distribute and possess narcotics, and possession and brandishing of firearms while engaging in that conspiracy.[4] Trial commenced on April 18, 2005, and on June 6, 2005, a jury returned a guilty verdict on all counts. Rodriguez received a 360-month sentence; Hardwick, Murray, and Resto received life sentences on the conspiracy count, and additional consecutive sentences for their 18 U.S.C. § 924(c) convictions.

---

2005.

[4] Specifically, Count One charged Defendants and Saldana with conspiring to distribute, and possess with intent to distribute, more than one kilo of heroin and more than 50 grams of crack, contrary to 21 U.S.C. §§ 841(a)(1), (b)(1)(A), in violation of 21 U.S.C. § 846. Count Two charged Murray with being a felon in possession of a firearm , in violation of 18 U.S.C. §§ 922(g)(1) and 2. Counts Three through Five charged Murray, Resto, and Hardwick, respectively, with possessing, brandishing, discharging, and using a firearm during 1998 to 2002 in furtherance of the drug-trafficking conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(C), and 2. Count Six charged Murray, Resto, and Hardwick with possessing, brandishing, discharging, and using firearms in furtherance of the drug-trafficking conspiracy on February 19, 2001 in violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(C), and 2. Count Seven charged Murray and Resto with the same violations on March 11, 2001. Finally, Count Eight charged Murray and Resto with the same violations on October 19, 2001.

The defendants appealed on numerous grounds,[5] the most salient of which was whether the admission into evidence of a redacted proffer statement, after the close of the Government's case-in-chief, violated defendants' constitutional rights under the Confrontation Clause. Because we find that the use of the proffer statement was harmless error, and we find no merit in the other issues brought on appeal, we affirm. The Government concedes, however, that the sentences for Hardwick, Murray, and Resto should be reduced to only one § 924(c) conviction each; accordingly, we remand for appropriate resentencing of these three defendants on their § 924(c) counts.

## II.

During the investigation before trial, Murray entered into a proffer agreement with the Government. Under this proffer agreement, Murray agreed to cooperate with the investigators by answering questions truthfully and completely, and the Government agreed not to use these statements against him at trial in its case-in-chief. The proffer agreement provided for an exception, however, if the Government needed "to rebut any evidence or arguments offered on [Murray's] behalf." Murray App. 89. Murray was interviewed under this agreement on October 11, 2002, and October 23, 2002. During these interviews, he admitted to planning and participating in the slaying of two individuals, Hiram "Chubby" Rosa and Kenneth

---

[5] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over the challenges to the convictions under 28 U.S.C. § 1291 and over the challenges to the sentences imposed under 18 U.S.C. § 3742(a).

"Smoochie" Allen.

After the close of its case-in-chief, the Government filed a motion in limine to introduce Murray's proffer statements. Although Murray did not testify at trial, the Government argued that Murray had breached the proffer agreement by attempting to elicit contradictory evidence (i.e., that Murray had a lesser role in those killings) through cross-examination.

The District Court granted the Government's motion, finding that the cross-examinations conducted by Murray's counsel contradicted the proffer statements and thus triggered the waiver. To allay any Confrontation Clause concerns, the District Court ordered that all references to Murray's co-defendants be redacted and replaced with neutral references such as "others" or "another person." In addition, the District Court instructed the jury that it could consider the proffer statements only to assess Murray's guilt, and not the guilt of any other defendant.

Murray challenges the District Court's ruling on two grounds. First, he argues that he did not trigger the waiver because his cross-examinations only impeached the credibility of the Government's cooperating witnesses, without contradicting his proffer statements. Second, he contends that, even if the waiver was triggered, the Government waived its ability to introduce the proffer statements because it did not object contemporaneously to the cross-examinations or make a timely motion to admit rebuttal evidence. Additionally, Hardwick, Resto, and Rodriguez complain that the admission of Murray's proffer statements after the close of the Government's case-in-chief violated their rights under the Confrontation

Clause of the Sixth Amendment.

## A.

### The Enforceability of the Waiver

As a threshold matter, we consider whether the waiver clause in Murray's proffer agreement was enforceable before determining whether it was properly invoked. Ordinarily, the Federal Rules of Evidence prohibit the use of statements made by a defendant during plea negotiations. Specifically, Federal Rule of Evidence 410 provides:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions: . . . (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

See also Fed. R. Crim. P. 11(f) (providing that the admissibility of any plea, plea discussion, or related statement is governed by Rule 410).

In United States v. Mezzanatto, 513 U.S. 196, 210 (1995), the Supreme Court held that a defendant could waive his rights under Rule 410 and Rule 11 as long as there is no "affirmative indication that the agreement [to waive] was entered into unknowingly or involuntarily." But the Mezzanatto Court only considered the enforceability of proffer waivers for impeachment purposes, and five justices expressed doubt as to whether a

-8-

waiver could be used to admit the defendant's statement in the Government's case-in-chief. Id. at 211 (Ginsburg, J., concurring) (warning that "a waiver to use such statements in the case in chief would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining"); id. at 218 (Souter, J., dissenting) (expressing concern that a defendant who gives such a waiver "will be unable even to acknowledge his desire to negotiate a guilty plea without furnishing admissible evidence against himself then and there").

Nevertheless, circuit courts that subsequently have considered the question have upheld the use of proffer waivers at trial. See United States v. Velez, 354 F.3d 190, 196 (2d Cir. 2004); United States v. Krilich, 159 F.3d 1020, 1025-26 (7th Cir. 1998); see also United States v. Rebbe, 314 F.3d 402, 407 (9th Cir. 2002) (upholding admission of proffer statements in rebuttal); United States v. Burch, 156 F.3d 1315, 1321-22 (D.C. Cir. 1998) (extending the majority opinion in Mezzanatto to allow the admission of plea statements in the case-in-chief). We are persuaded by the reasoning of these courts and find that the waiver agreement at issue in this case was enforceable.

## B.

### Triggering the Waiver

Determining whether Murray triggered the waiver requires an analysis of the terms of the waiver. A proffer agreement is a contract and its terms must be read to give effect to the parties' intent. United States v. Barrow, 400 F.3d 109, 117 (2d Cir. 2005) (quoting United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991)); see also United States v. Williams, 510 F.3d 416, 421-22 (3d Cir. 2007) (stating that plea agreements are analyzed

-9-

"according to contract law principles"); United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998) ("Plea agreements, although arising in the criminal context, are analyzed under contract law standards."). Because the interpretation of a contract generally is a question of law, we review the District Court's interpretation of the terms of the waiver *de novo*. Barrow, 400 F.3d at 117; see also United States v. Bernard, 373 F.3d 339, 341 (3d Cir. 2004) ("We exercise plenary review over the question of whether the terms of a plea agreement have been violated."). If the waiver applies to this case, we review the District Court's evidentiary rulings admitting Murray's proffer statements for abuse of discretion. Barrow, 400 F.3d at 117.

The terms of the waiver here were expansive, allowing the Government to use Murray's proffer statements not only to cross-examine him, but also "to rebut *any* evidence or arguments offered on [his] behalf." (emphasis added). Barrow, 400 F.3d at 118. Compare Krilich, 159 F.3d at 1024 (demonstrating more narrowly tailored waiver terms). Moreover, upon reviewing the trial transcripts, it is clear that Murray triggered the terms of the waiver by attempting to shift the blame for ordering the deaths of Rosa and Allen.

Regarding Rosa's death, Murray's cross-examination[6] attempted to elicit testimony that another drug gang, led by Mark Lee, had motive to kill Rosa. Murray elicited testimony that one of Rosa's associates was attempting to sell drugs in Lee's

---

[6] Murray did not testify. All our references to "Murray's cross-examination" refer to the cross-examinations conducted by Murray's counsel.

territory, leading to a loss in profits. Murray also attempted to insinuate that the van in which Moore was arrested might have been the same van used in Rosa's killing. Murray pursued these lines of questioning even though he had confessed in his proffer statements that he ordered Rosa's killing.

Likewise, Murray attempted to show that Ricky Perez gave the order and the gun to kill Allen. In cross-examining a cooperating witness, David Lopez, who had admitted to shooting Allen, Murray repeatedly asked whether Perez ordered Allen's death, even though Lopez had testified that he acted on Murray's orders. Murray also repeatedly questioned Perez whether he ordered Lopez to kill Allen, and whether he gave Lopez the gun used to shoot Allen. Murray also elicited testimony from Perez that Allen was disrupting Perez's drug sets and affecting his profits, in an attempt to pin the motive on Perez.

The testimony elicited from these witnesses on cross-examination was aimed at inferring that Lee and Perez, rather than Murray, were responsible for the murders of Rosa and Allen, contrary to the statements Murray made under the proffer agreement. See United States v. Frazier, 469 F.3d 85, 89 (3d Cir. 2006) (holding that, in certain circumstances, an attorney's cross-examination of a witness is tantamount to the assertion of an argument).

Murray's explanations for these lines of questioning are unavailing. According to Murray, his questioning was intended only to impeach the credibility of the Government's cooperating witnesses and to challenge their recollections of certain events. Nevertheless, the District Court felt Murray was also attempting to challenge any recollections regarding Murray's role in the

-11-

killings, thus opening the door for the Government to invoke the waiver to rebut these attempts.[7]  Accordingly, we find that the District Court did not abuse its discretion in admitting Murray's proffer statements.

## C.

### Timeliness of Exercise of Rights Under the Waiver

The record reflects that the Government waited seven days before objecting to one of the cross-examinations conducted by Murray, and waited twelve days before objecting to two other cross-examinations.  Murray argues that the Government's failure to make contemporaneous objections constituted a waiver of its right to admit his proffer statements under Federal Rule of Criminal Procedure 51 and Federal Rule of Evidence 103(a). We disagree.

Murray's argument conflates the right to object to the introduction of evidence with the right to enforce a contract.  See

---

[7]  The District Court stated:

> I was struck during the course of this trial to some of the cross examination about the van and about the arguments that these other people may have had with the victims of the murder and I was struck that counsel may have been suggesting that someone else was responsible for these murders and not, in fact, Mr. Murray as he so allegedly told the F.B.I.

Appellee's App. 215-16.

-12-

Liranzo, 944 F.2d at 77 ("Pre-trial agreements, such as cooperation agreements and proffer agreements, are interpreted according to principles of contract law."). The Government was not lodging an objection to Murray's line of cross-examination; rather, it was exercising its contractual right under the proffer agreement. The proffer agreement did not preclude Murray from introducing evidence or making arguments contrary to the proffer agreement, nor did it provide the Government with a right to object when Murray did so. See Velez, 354 F.3d at 196 ("[A] defendant remains free to present evidence inconsistent with his proffer statements, with the fair consequence that, if he does, 'the Government [is] then . . . permitted to present the defendant's own words in rebuttal.'" (citation omitted)). Instead, it provided the Government with the right to use the proffer statements to rebut any arguments offered on Murray's behalf. Thus, the Government did not waive its right to introduce the proffer statements by not objecting contemporaneously to the cross-examinations.

## D.

## Confrontation Clause

Hardwick, Resto, and Rodriguez argue that the admission of Murray's proffer statements violated their rights under the Confrontation Clause of the Sixth Amendment. Although the District Court ordered the statements to be redacted to replace any references to Murray's co-defendants with neutral terms such as "others" or "another person," they argue that they were prejudiced even by these neutral terms, which strongly implicated them in the killing of Rosa in light of earlier evidence placing them in the van used in the shooting.

-13-

The Confrontation Clause of the Sixth Amendment, extended to the States by the Fourteenth Amendment, guarantees a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right includes the ability to cross-examine witnesses. See Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965).

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the introduction of a non-testifying defendant's out-of-court statement, which directly implicated his co-defendant by name, violated the Confrontation Clause right of the co-defendant. Even though the jury was given clear instructions not to consider the confession in determining that co-defendant's guilt, the Supreme Court held that it could not "accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination." Id. at 137. The Supreme Court reasoned that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great . . . that the practical and human limitations of the jury system cannot be ignored." Id. at 135.

Subsequently, the Supreme Court held in Richardson v. Marsh that this problem could be cured by redacting the confession "to eliminate not only the [co-defendant's] name, but any reference to his or her existence." 481 U.S. 200, 211 (1987). Critically, the confession in Richardson differed from the one in Bruton because it had been redacted so completely that it was no longer incriminating on its face, and became so only when linked with other evidence introduced at trial. Id. at 208. The Supreme Court declined to extend Bruton in that case because the risk of potential prejudice to the co-defendant no longer outweighed the pragmatic necessity of joint trials. "[N]o opinion" was expressed

-14-

"on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." Id. at 211 n.5.

But the Supreme Court revisited that question in Gray v. Maryland, 523 U.S. 185 (1998), holding that redactions that substituted the co-defendant's name with placeholders such as blank spaces or the word "deleted" did not pass muster. Such placeholders were problematic because they "refer[red] directly to the 'existence' of the nonconfessing defendant." Id. at 192. In the Supreme Court's view, the redacted statements in Gray "so closely resemble[d] Bruton's unredacted statements" that the law required the same result. Id.

Since Gray, we have considered the constitutionality of redacted confessions in two cases: United States v. Richards, 241 F.3d 335 (3d Cir. 2001), and Priester v. Vaughn, 382 F.3d 394 (3d Cir. 2004). In Richards, the defendant's confession stated that he had planned the robbery at issue with a "friend." Other testimony showed that the two co-defendants were friends. We held that this reference to the "friend" was "just as blatant and incriminating . . . as the word 'deleted' in the Gray case." 241 F.3d at 341.[8]

In Priester, however, we found that substitutions such as "the other guy," "someone," "someone else," "the guy," and "another guy" did not violate the Confrontation Clause where

---

[8] Although we concluded that a Bruton error occurred in Richards, we found that the issue had not been preserved. Consequently, under plain error review, we found that the error was not so prejudicial as to require reversal. 241 F.3d at 341-42.

there were "at least fifteen perpetrators in various cars involved in the shooting." 382 F.3d at 399. Unlike Richards, where "the word 'friend' unequivocally pointed to Richards," the only other co-defendant, Priester involved so many perpetrators that "the phrases 'the other guy' or 'another guy' [were] bereft of any innuendo that tie[d] them unavoidably to Priester." Id. at 400-01.

What these decisions underscore is that the nature of the linkage between the redacted statement and the other evidence in the record is vitally important in determining whether a defendant's Confrontation Clause right has been violated. Even redacted statements will present Confrontation Clause problems unless the redactions are so thorough that the statement must be linked to other evidence before it can incriminate the co-defendant. See Richardson, 481 U.S. at 208; see also Gray, 523 U.S. at 196 (finding issue with redactions that leave "inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial").

Assessing the "kind" of inference present here, and not the "simple fact of inference," leads us to conclude that the admission of Murray's proffer statements violated the Confrontation Clause rights of Murray's co-defendants. Cf. Gray, 523 U.S. at 196 (noting that redactions that leave over-simplistic inferences do not satisfy the concerns of Bruton and Richardson, which "must depend in significant part upon the kind of, not the simple fact of, inference"). Although this trial involved multiple co-defendants, only two—not including Murray—were charged with killing Rosa. Redacted references to "others in the van" referred directly to their existence, and the unavoidable inference was that they were the ones who "exited

[the] vehicle and started firing their weapons at Rosa." Murray App. 99. The redacted version of the text explicitly excluded Perez and Murray, the only other passengers, from the "others" who left the van. Because Murray exercised his right not to testify at trial, Hardwick and Resto were unable to confront him and challenge his testimony. This violated the Confrontation Clause.[9]

Although we conclude that the District Court erred in admitting the proffer statements, we will affirm "if we find the error is harmless beyond a reasonable doubt." Richards, 241 F.3d at 341. "An error is harmless if it 'does not affect substantial rights' of the defendant." United States v. Jimenez, 513 F.3d 62, 83 (3d Cir. 2008) (quoting Fed. R. Crim. P. 52(a)). This occurs when the record shows "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" United States v. Fallon, 470 F.3d 542, 547 (3d Cir. 2006) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). As we have stated, an "'otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the . . . error was harmless beyond a reasonable

---

[9] The Government also relies heavily on the District Court's limiting instruction, but it is clear that "certain 'powerfully incriminating extrajudicial statements of a codefendant' . . . are so prejudicial that limiting instructions cannot work. Unless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the Bruton court found." Gray, 523 U.S. at 192 (citations omitted).

doubt.'"  Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)).

The evidence in this case was more than sufficient to support the jury's verdict, even without the offending proffer statements.  At trial, several witnesses testified to the participation of Hardwick and Resto in the murders of Rosa and Allen.  Ricky Perez detailed the roles played by himself, Resto, Murray, and Hardwick in the killings of Rosa and Allen.  Another witness named Arnaldo Gomez described the escalating dispute between Rosa and Hardwick.  David Lopez, who admitted that he personally shot Allen, testified that he, Perez, Murray, and Resto planned the killing.  The prosecution also offered testimony of a New Jersey Police ballistics expert that AK-47 shell casings from the Rosa murder scene matched those found at the murder scene of the third victim, Troy James, coupled with testimony from Ricky Perez that Murray admitted killing James with the same AK-47 that Resto used to kill Rosa.

The overwhelming evidence convinces us that the District Court's error was harmless beyond a reasonable doubt.  See Monachelli v. Warden, SCI Graterford, 884 F.2d 749, 753 (3d Cir. 1989) ("[A] Bruton violation will not result in a reversal where the independent, 'properly admitted evidence of [the defendant's] guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of

-18-

the admission was harmless error.'" (quoting <u>Schneble v. Florida</u>, 405 U.S. 427, 430 (1972))).  Accordingly, we will affirm.[10]

## III.

The defendants raise a host of additional arguments on appeal, <u>see</u> note 1, <u>supra</u>, none of which has merit.  The Government, though, has agreed that the multiple consecutive sentences imposed on Hardwick, Murray, and Resto under § 924(c) should be remanded with instructions to vacate all but one § 924(c) conviction each, in compliance with a Justice Department policy memorandum requiring a separate predicate offense for each § 924(c) charge.[11]

---

[10]  The defendants also argue that admitting Murray's proffer statements was unduly prejudicial and therefore the District Court abused its discretion under Federal Rule of Evidence 403 by admitting this evidence.  Resto also argues that he was entitled to severance based on the admission of Murray's proffer statements.  Even if the District Court erred, any error was harmless given the tremendous amount of evidence in the record supporting the jury's verdict.

[11]  On page 28 of its brief, the Government represents:
> Accordingly, the United States requests that this Court remand these three Defendants' cases to the district court, with instructions to vacate the sentences imposed for all but one § 924(c) conviction each; that conviction should be chosen by the Government, and to comport with the intent of Congress, should reflect

For the foregoing reasons, we will affirm the jury's verdict as to all four defendants, and remand only for resentencing of Murray, Resto, and Hardwick consistent with the Justice Department policy memorandum.

---

the highest mandatory penalty supported by the evidence.
Appellee's Br. 28.

**Appendix A**

I. Redacted Proffer Statement (October 11, 2002)

MR. SWEENEY[1]:   Murray advised that he had an ongoing dispute with individuals by the name of Gerard Jackson and Shaheed Wilson. This dispute originated from Mark Lee a/k/a Moe being upset that Gerard Jackson opened a crack cocaine house flow at 728 Vine Street. This house flow directly conflicted with his flow and the cocaine and marijuana flow at 7th and Vine Street Camden, New Jersey. This altercation became physical when Wilson fought Lee in a fist fight with Lee losing the fight. This dispute continued with Alvin Coleman, friend of Gerard Jackson and Shyeve [sic] Wilson when Coleman got into a fight with Michael Moore a/k/a Snook, a friend of Moe. Coleman punched Moore who had had a weapon on his person and he shot Coleman in the leg area. Jackson continued to sell crack cocaine from his mother's house on Vine Street when Arnaldo Gomez a/k/a Nandito complained that the money slash drug flow

_____

[1]  Sweeney was the government agent who interviewed Murray on October 11, 2002, and October 23, 2002, pursuant to the proffer agreement. He took the stand on May 25, 2005, to read the redacted proffer statements into the record.

-1-

## Appendix A

was being messed up by Jackson's drug operation. Nandito was the manager of the 7th and Vine Street crack cocaine flow. Jackson was approached and advised that he couldn't sell drugs in the area. B-Nice advised he was supplying with cocaine and the flow was being slowed down by Jackson's drug set. B-Nice advised at some point he told Wilson that he and Jackson had to leave the block. Approximately one week later, Enrique Perez a/k/a/ Rick and B-Nice talked to Nandito who advised that Jackson was continuing to sell crack from the house. Both men traveled to Jackson's house on Vine Street and waited out in front of his house. Jackson. [sic] According to B-Nice, he called Jackson's name who was located in the house and Jackson advised them to weight [sic] a minute. B-Nice entered his black Honda Accord Station Wagon which he drove to Jackson's house. Rick Perez drove his green vehicle and parked directly in front of Jackson's house next to Murray's vehicle. According to Murray, Jackson started firing his weapon out of the house and in their direction attempting to kill them. Both Murray and Perez fled the area on foot. B-Nice fled towards 8th and State Streets

-2-

## Appendix A

while with [sic] Perez running toward Linden Street Camden, New Jersey. B-Nice recalled that the incident happened during the weekday and [sic] the time of 1300 hours. B-Nice advised he ran to Yamilee Coffigny's house on State Street who eventually drove him home to his Dayton Street address. B-Nice advised that he grabbed his 9 millimeter handgun with Rick Perez grabbing his 380 caliber handgun from his residence on 34th Street, Camden, New Jersey. Together both Murray and Perez traveled around the area looking for Gerard Jackson and Shaheed Wilson. Murray advised that both Perez and Murray obtained a vehicle from Anthony Perez that was white in color. Both Perez and Murray, and [sic] observed Wilson on State Street around 1600 hours. They displayed their weapon [sic] to Wilson and demanded to know where Gerard Jackson was located. Wilson was able to break away from Murray and fled the scene. Wilson called the police and signed complaints against Murray. Several days went by and an incident occurred where Hiram Rosa shouted threats in the direction of Murray and Perez while they were standing on the 500 block of Vine

-3-

## Appendix A

street [sic], Camden, New Jersey. As a result they decided to kill Rosa. Another person rented a gray blue van from a rental agency and provided it, an AK47 and 45 caliber handgun. Another person advised that he got word that Rosa and Gerard Jackson were located at Cooper Hospital. Perez and Murray and others drove around and attempted to locate both individuals. B-Nice stated that Perez had the 9 millimeter and he had a 38 caliber handgun that is, as they [sic], as they were driving around. Murray described the vehicle as a white Ford Tarusus [sic]. They followed the vehicle onto Broadway Street in Camden and into the Rutgers Campus. They temporarily lost the vehicle an [sic] found it on a dark street. B-Nice advised that he was located in the very back of the vehicle when they drove past Rosa's vehicle because he was driving slow. Rosa pulled his vehicle to the side and the others in the van neither Perez nor Murray exited their vehicle and started firing their weapons at Rosa. After the shooting, they left in a hurry in the direction of North Camden. They decided to split up with Perez an [sic] B-Nice traveling to Perez's residence on 34th Street Camden, New

-4-

## Appendix A

Jersey. Murray advised he recalled that night of the shooting he and Perez had a lengthy discussion about not being involved with the shooting.

(Appellee's App. 223)

II. Redacted Proffer Statement (October 23, 2002)

MR. SWEENEY: Murray advised that he wanted to change some details about the Rosa homicide. Murray advised that during the actual shooting of Hiram Rosa, Rick Perez had the AK47 assault rifle and another had the 45 caliber handgun. Murray also advised that Hiram Rosa was very agitated with the events that unfolded and made over [sic] threats towards them. Murray recalled on one occasion that Rosa shouted "It ain't over." When the shooting incident occurred, Murray advised he had a 380 caliber weapon. Murray advised the AK47 and 45 caliber handgun were used in the Rosa homicide. Murray state [sic] that Perez and another person were the actual shooters of Rosa. Murray advised that another person rented a gray colored Dodge Caravan that was utilized to do the murder. Murray did not know what happened to the vehicle after the incident. Pertaining to the

-5-

## Appendix A

Kenneth Allen a/k/a Smooch murder, Murray advised that David Lopez was the manager of the 9th and Cedar Street heroin set [sic] according to Murray the bundles and money kept coming up short by about 1500 to 2000 dollars. Lopez wanted to show someone that [sic] stealing the bundles; therefore he placed a stash in the area where he could observe it. Lopez observed Allen steal the stash. Lopez called Rick Perez and Murray and another person. They responded to the area of 9th and Cedar Streets, Camden, New Jersey. While at Lopez's residence on Cedar Street, they discussed the situation on whether or not to kill or beat up Kenneth Allen. During that conversation, it was decided that Allen would be killed. Specifically Murray advised that he instruct [sic] the other person to handle the situation with David Lopez. B-Nice advised he drove David Lopez to the area of 9th and Vine Streets, Camden New Jersey. They observed Kenneth Allen during the altercation Smooch started to win the fight against David Lopez. I'm sorry. During that altercation, Smooch started to win the fight causing David Lopez to exit Murray's vehicle and approach the situation.

-6-

Smooch started to runaway [sic] from the area causing David Lopez to fire his weapon at Smooch. Murray advised he observed Smooch stumble and continue to run as he was being fired at. Murray advised Lopez caught up to Smooch and finished him off. Murray advised that the other person who was firing at Smooch at the same time was David Lopez [sic]. Murray recalled approximately ten to 16 shots were fired during the incident. Murray advised that the shooting, that after the shooting was over, he picked up Lopez and the other person on 10th Street and drove over to Rick Perez's house. At Perez's house Murray advised both this other person and David Lopez were both amped up about the situation and David Lopez volunteered to do the other shootings in the future. Murray advised he stated to Perez Dave and the other person handle their business. After the conversation, all guns used in the shooting were given to Rick Perez while located in his residence.

(Appellee's App. 224)