**NOT PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 09-3985
_____

UNITED STATES OF AMERICA

v.

RAYMOND VELLA,
                              Appellant
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Crim. No. 3-08-cr-00374-001)
District Judge:  Hon. Anne E. Thompson
_____

Argued December 14, 2010

BEFORE:  SLOVITER, GREENAWAY, JR., and
STAPLETON, *Circuit Judges*

_____

(Opinion Filed: February 24, 2011)
_____

Alan L. Zegas (Argued)
Terel L. Klein
William Nossen
Law Offices of Alan L. Zegas
552 Main Street
Chatham, NJ  07928
  Attorneys for Appellant

Richard E. Constable, III
George S. Leone
Steven G. Sanders (Argued)
Office of the United States Attorney
970 Broad Street – Room 700
Newark, NJ  07102
  Attorneys for Appellee

_____

OPINION OF THE COURT
_____


STAPLETON, *Circuit Judge*:

Raymond Vella was tried and convicted of five counts of honest services and mail fraud, two counts of federal program fraud, and one count of federal program bribery. Vella raises several claims of error.  We will affirm.

I.

The Linden Neighborhood Preservation Program ("LNPP") was designed to provide needed repairs to lower income households in the City of Linden, New Jersey, and was funded in part by grants from the United States Department of Housing and Urban Development ("HUD").  Frank Rose, a Linden employee who ran the LNPP, solicited bids and determined which contractors were to be awarded jobs.  Within two

2

months of taking over the LNPP, Rose began a bid-rigging scheme involving five contractors, including Vella.

Rose's scheme involved providing one of the contractors with the computer generated pricing list for a job (even though Rose knew he was not permitted to do so, and the contractors knew they were not permitted to see the pricing list) and instructing the contractor to submit a bid near the total price reflected on the list. Rose would at the same time instruct the other contractors to submit bids that were higher than the "winning" bid. Rose would rotate the "winning" bids based on the contractors' availabilities and their abilities to handle the jobs. In exchange, Rose would receive cash payments from the contractors.

A grand jury in the District of New Jersey returned an eight-count indictment charging Vella with five counts (Counts One through Five) of participating in a scheme to defraud Linden's citizens of money and property and their intangible right to honest services, by use of the mails, in violation of 18 U.S.C. §§ 1341 and 1346; one count (Count Six) of federal program bribery, in violation of 18 U.S.C. § 666(a)(2); and two counts (Counts Seven and Eight) of federal program fraud, in violation of 18 U.S.C. § 666(a)(1)(A). Each of the counts also charged Vella with aiding and abetting in the commission of the crimes charged, in violation of 18 U.S.C. § 2. A jury returned a verdict of guilty against Vella on all eight counts. Vella now appeals.[1]

II.

_____

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

3

Vella first contends that the District Court erred in admitting into evidence the proffer statement he gave to the Government during its investigation of Rose's scheme. Before he was indicted, Vella sat for a proffer session with federal authorities and executed a proffer agreement, which provided, in pertinent part, that:

> (1) Should [Vella] be prosecuted, no statements made by [Vella] during the interview will be used against [Vella] in the government's case-in-chief at trial or for purposes of sentencing, except as provided below.

> * * *

> (4) The government may use [Vella's] statements and any information provided by [Vella] to cross-examine [Vella] and to rebut any evidence or arguments offered on [Vella's] behalf.

During the session, Vella denied any knowledge of Rose's illegal activities. Vella was also asked to disclose all recent contacts with Rose, but he failed to mention a meeting that occurred at the Linden Home Depot. According to Rose and Home Depot employee Nellie Krawiec, Vella went to the store, told Krawiec that his cell phone was not working, and asked Krawiec to call Rose on the store's phone and tell him that he had won a prize. Krawiec made the call, and Vella grabbed the phone, warned Rose not to ask questions, and told him to come to the Home Depot. When Rose arrived, Vella told him that the authorities had come to his home and asked whether he had paid kickbacks to Rose.

At trial, despite the fact that Vella had failed to mention the Home Depot meeting during the proffer session, defense counsel stated the following in his opening:

4

And talking about the details of a particular case, in particular, this meeting at Home Depot that the government led with, obviously, placing a great deal of importance on that meeting. The government alluded to the fact that my client, in some way, tipped off Frank Rose to this investigation. That's not accurate.

\* \* \*

So when you listen to Frank Rose's testimony about this meeting at Home Depot, think of the phrase "The devil is in the details." Because you are going to see, ladies and gentlemen, as with all of Frank Rose's testimony, that he is not going to talk about specifics, he's going to talk about generalities, and when he talks about that Home Depot meeting, I submit to you that a lot of what he's going to say is information that is made up because he wants to implicate my client in this scheme.

In addition, defense counsel's cross-examination of Rose, who testified for the Government, included the following line of questioning:

> Q.     You had a meeting with [Vella] at the Home Depot, correct?

\* \* \*

> A.     No, I wouldn't call it a meeting. I went there to find out what was going on.

\* \* \*

> Q.     Now, during, up until that [meeting], you had never told my client to lie to investigators, had you?

> A.     No I haven't.

> Q.     You never had a meeting with him like you did with the other contractors . . . to solicit them to lie to investigators, did you?

5

A.   No, why would I, because the investigators already had talked to him before I could even speak to him.

*  *  *

Q.   So after you surmised that investigators had gone to see my client, you did not meet with him to ask him to lie to investigators, did you?

A.   As, I'll repeat as I said before.  He told me he would get in touch with me.  I left it at that and I met him at Home Depot when he called me.

Q.   And you didn't tell him at Home Depot to lie to investigators, did you?

A.   No, because I thought he was wired.

Finally, cross-examination of Krawiec produced the following testimony:

Q.   Have any interest in why he was making a call?

A.   No.

Q.   Okay.  You mentioned something about playing a joke on someone.  Did Mr. Vella joke with you often when he came to see you at the Home Depot?

A.   Yes.

Q.   And was that a frequent occurrence?

A.   Yes.

Based on the foregoing, the Government argued that Vella triggered the proffer agreement's waiver provision, and sought to introduce, during its case-in-chief, evidence that Vella failed to mention the Home Depot meeting during his proffer session.  The Government argued that this evidence rebutted Vella's suggestion that the Home Depot meeting had occurred but was innocuous.  The District Court agreed with the

6

Government and admitted the evidence over Vella's objection. The Government thereafter elicited from a federal agent that Vella had not disclosed during the proffer session that the Home Depot meeting occurred, despite being asked to disclose all of his meetings with Rose.

Vella contends that the admission of this evidence was error. "Because the interpretation of a contract generally is a question of law, we review the District Court's interpretation of the terms of the waiver *de novo*," but "we review the District Court's evidentiary rulings admitting [the] proffer statements for abuse of discretion." *United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008).

As stated above, Vella's proffer agreement provided that "[s]hould [Vella] be prosecuted, no statements made by [Vella] during the interview will be used against [Vella] in the government's case-in-chief at trial." The agreement contained an exception to this rule, however, stating that "[t]he government may use [Vella's] statements and any information provided by [Vella] to cross-examine [Vella] and to rebut any evidence or arguments offered on [Vella's] behalf." Thus, we focus on the language of the waiver, and more specifically: (1) whether defense counsel's opening statement and cross-examination were "evidence or arguments offered on [Vella's] behalf" that triggered the waiver; and (2) whether Vella's failure to mention the Home Depot meeting was "information provided by" him that "rebut[ted]" the "evidence . . . offered on his behalf."

In *Hardwick*, we dealt with a proffer agreement waiver provision identical to the one here. 544 F.3d at 570 ("The terms of the waiver here were expansive, allowing the Government to use Murray's proffer statements not only to cross-examine him, but also

7

'to rebut *any* evidence or arguments offered on [his] behalf.'"). In the case, the defendant in his proffer session "admitted to planning and participating in the slaying of two individuals." *Id.* at 569. However, at trial, defense counsel's "cross-examination attempted to elicit testimony that another drug gang . . . had motive to" carry out the killings, and attempted to show that someone else "gave the order and the gun to" carry out one of the killings. *Id.* at 570-71. Because "[t]he testimony elicited from these witnesses on cross-examination was aimed at inferring that [someone else was] responsible for the murders . . . , contrary to the statements [the defendant] made under the proffer agreement," the Court concluded that "the District Court did not abuse its discretion in admitting [the] proffer statements." *Id.* at 571.

Here, the portions of defense counsel's opening statement and cross-examination referenced above were aimed at inferring that the Home Depot meeting indeed occurred but was innocuous, in order to oppose Rose's assertion that Vella informed him at the Home Depot that the authorities were investigating the kickback scheme. And like in *Hardwick*, defense counsel's statements were in conflict with the information that came out of Vella's proffer session, namely that the Home Depot meeting had not occurred. *See United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) ("[R]ebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary.").

Vella makes much of the fact that *Hardwick* dealt with a defendant's affirmative proffer statement (that he planned and participated in two homicides), while here we deal

8

with information that went unmentioned in the proffer session (that the Home Depot meeting occurred). This distinction does not lead to a different outcome. Vella was specifically asked to name all of his recent meetings with Rose, and so we see no difference between the scenario here and the affirmative statement in *Hardwick*. Put another way, we see no legal distinction, relating to whether the waiver provision here was triggered, between Vella being asked to name all of his recent meetings with Rose and omitting the Home Depot meeting, and, for example, Vella being asked if the Home Depot meeting occurred and responding in the negative. In either case, doubt would be cast on the truthfulness of the argument advanced by defense counsel, namely that the Home Depot meeting was innocuous.

Vella argues also that the District Court's ruling violated his Fifth Amendment rights, because it forced him to testify and explain that he did not intend to cover up the Home Depot meeting. However, "[o]missions from . . . proffer statements enjoy no Fifth Amendment protection," because "[u]nlike an arrestee who has a right to remain silent and who has ordinarily been advised of this right, . . . [an individual giving a proffer statement has] voluntarily agreed to speak with government officials." *Barrow*, 400 F.3d at 122. Additionally, Vella did not address in his direct examination the subject of his failure to mention the Home Depot meeting during his proffer session, and so he cannot now credibly argue that he was forced to waive his Fifth Amendment privilege against self-incrimination. In fact, when the subject came up on cross-examination, Vella readily admitted that he failed to disclose the meeting, and even then he made no effort to show that he misunderstood the questions that were put to him.

9

In light of the foregoing, the District Court did not err in concluding that the waiver provision in Vella's proffer agreement was triggered, and did not abuse its discretion when it admitted evidence of his proffer statement.

III.

Vella next contends that the trial evidence was insufficient to support the jury's verdict on Counts One through Five, the honest services and mail fraud counts. "When evaluating a sufficiency of the evidence challenge, we must view the evidence in the light most favorable to the government and must sustain the jury's verdict if a reasonable jury believing the government's evidence could find guilt beyond a reasonable doubt." *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010) (internal quotations and citations omitted). "We will overturn a conviction for insufficient evidence only if 'no rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt.'" *United States v. Holmes*, 607 F.3d 332, 335 (3d Cir. 2010) (quoting *United States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002)).

The mail fraud statute[2] "does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all

---

[2] The statute provides as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail . . . any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). Put another way, "'[t]o prove mail . . . fraud, the evidence must establish beyond a reasonable doubt . . . the use of the mails . . . in furtherance of the scheme.'" *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (quoting *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001)). In addition, the evidence must establish that the defendant knowingly caused the mails to be used. With reference to this element, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954) (citing *United States v. Kenofskey*, 243 U.S. 440 (1917)).

Here, the trial evidence established that once an LNPP project was approved and a contractor selected, the City of Linden would submit a request for payment to Union County, certifying (falsely, with regard to the projects that were part of Rose's scheme) that no one associated with the LNPP had a personal financial interest in the project and that no bonus or commission had been demanded or paid to secure approval of that project. Union County would then mail a check to Linden to fund the LNPP contracts, the County having already applied for and received funds from HUD.

Vella contends that this evidence was insufficient to support his mail fraud convictions because the evidence did not demonstrate that the checks that were the bases for Counts One through Five "were mailed 'for the purpose of executing' the kickback scheme." Appellant's Br. at 45. Vella argues that the fraud was committed when Rose gave bidding information to the contractors, and the contractors submitted rigged bids.

11

Thus, he argues, the mailings were tangential to the scheme, and not "in furtherance of"

it, because the mailings, "which had been made in the ordinary course of business for 30

years while the [LNPP] was in existence, would have been made in the absence of the

scheme." *Id.* at 50.

Vella's argument is unavailing. In *Schmuck v. United States*, 489 U.S. 705 (1989),

the defendant:

> purchased used cars, rolled back their odometers, and then
> sold the automobiles to Wisconsin retail dealers for prices
> artificially inflated because of the low-mileage readings.
> These unwitting car dealers, relying on the altered odometer
> figures, then resold the cars to customers, who in turn paid
> prices reflecting Schmuck's fraud. To complete the resale of
> each automobile, the dealer who purchased it from Schmuck
> would submit a title-application form to the Wisconsin
> Department of Transportation on behalf of his retail customer.
> The receipt of a Wisconsin title was a prerequisite for
> completing the resale; without it, the dealer could not transfer
> title to the customer and the customer could not obtain
> Wisconsin tags. The submission of the title-application form
> supplied the mailing element of each of the alleged mail
> frauds.

*Id.* at 707. The Supreme Court ruled that these mailings were sufficient to support the

defendant's mail fraud conviction, and in so ruling, distinguished its prior decision in

*Parr v. United States*, 363 U.S. 370 (1960):

> *Parr* . . . involved a . . . fraudulent scheme through which the
> defendant school board members misappropriated school
> district tax revenues. The Government argued that the
> mailing element of the mail fraud charges was supplied by the
> mailing of tax statements, checks, and receipts. This Court
> held, however, that in the absence of any evidence that the tax
> levy was increased as part of the fraud, the mailing element of
> the offense could not be supplied by mailings "made or
> caused to be made under the imperative command of duty

12

imposed by state law." 363 U.S. at 391. No such legal duty is at issue here. Whereas the mailings of the tax documents in *Parr* were the direct product of the school district's state constitutional duty to levy taxes, *id.* at 387, and would have been made regardless of the defendants' fraudulent scheme, the mailings in the present case, though in compliance with Wisconsin's car-registration procedure, were derivative of Schmuck's scheme to sell "doctored" cars and would not have occurred but for that scheme.

*Schmuck*, 489 U.S. at 713 n.7.

The mailings in *Schmuck* were not required under state law, as the mailings were in *Parr*, but were instead done in the ordinary course of business in compliance with the state car registration procedure, in order to complete car sales. Similarly, the mailings here were not required by law, but were rather done in the ordinary course of business in compliance with the LNPP, in order to obtain the funding necessary to pay the contractors. Thus, the mailings of checks here would not "have been made in the absence of the scheme," Appellant's Br. at 50, because while the scheme may have been premised on bid-rigging, the ultimate goals of the scheme were: (1) for the contractors, including Vella, to be awarded the contracts and be paid for them; and (2) for Rose to receive money in return. Without checks having been mailed, there would have been no funds for these contracts, the contractors would have had no motivation to participate in the scheme, and Rose would have received no money. Put another way, without the checks that were sent through the mail, the scheme would never have existed. In sum, based on the Supreme Court's reasoning in *Schmuck*, the mailings here were sufficient to support Vella's mail fraud convictions.

13

Vella argues also that the Government presented no evidence that he knew that the checks that were the bases for Counts One through Five were sent by mail, because there was no evidence that any of the contractors were aware that the checks came from any place other than the City of Linden. However, "[a]ll that was required was proof that a mailing . . . would have been reasonably foreseeable to an objective observer." *United States v. Tiller*, 302 F.3d 98, 103 (3d Cir. 2002). "[T]he prosecution was not obligated to show that [Vella] planned a mailing or even knew that mailings would occur." *Id.*

Although Vella did not testify that he knew the mails were used to transmit LNPP funds, he did state that he knew that Linden received LNPP funding from Union County. An objective observer would foresee that the mails would be used to send the funds from the County to the City. *See United States v. Genova*, 333 F.3d 750, 760 (7th Cir. 2003) ("Not in his wildest dreams could Gulotta have imagined that Genova . . . would take the forms to the County Clerk's office by bicycle for filing[, and] [s]o when Genova did the expected – omitting the kickbacks and mailing the forms – this was reasonably foreseeable, or so the judge could conclude without making a clear error of fact.").

For the foregoing reasons, sufficient evidence supported Vella's convictions on Counts One through Five of the indictment.[3]

IV.

---

[3] Vella argues also that his convictions should be overturned because 18 U.S.C. § 1346 is unconstitutionally vague on its face. Vella failed to raise this issue before the District Court, and thus he has waived it. *See Sacred Heart Hosp. v. Dep't of Pub. Welfare*, 133 F.3d 237, 241 n.6 (3d Cir. 1998) ("[W]e need not address this argument and, thus, the constitutionality of 11 U.S.C. § 106(c), because Sacred Heart failed to raise this issue below and, therefore, for purposes of this appeal, has waived it.").

14

Vella also raises a challenge to the sufficiency of the evidence supporting the jury's verdict on Counts Seven and Eight, the federal program fraud counts. As outlined above, "[o]ur review of the sufficiency of the evidence after a conviction is 'highly deferential.'" *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001) (quoting *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir. 2000)).

Section 666 of Title 18 provides that "an agent of . . . a State [or] local . . . government" commits a crime if such agent "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner . . . property . . . under the . . . control of such . . . government." 18 U.S.C. § 666(a)(1)(A). "Agent" is defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Vella contends that his convictions on Counts Seven and Eight should be reversed because the Government failed to show that he was an "agent" within the meaning of the statute. Vella argues that the trial evidence showed that he was an independent contractor, not a representative of, or an individual authorized to act on behalf of, the LNPP.[4]

However, Counts Seven and Eight alleged that Rose was an "agent" of the LNPP, and charged Vella with aiding and abetting, pursuant to 18 U.S.C. § 2, Rose's violation of

---

[4] Vella actually seeks to have his convictions on Counts Six, Seven, and Eight vacated on this ground. However, Count Six charged Vella with violating 18 U.S.C. § 666(a)(2), which did not require the Government to prove that Vella was an "agent." Accordingly, this challenge applies only to Counts Seven and Eight.

15

18 U.S.C. § 666(a)(1)(A).  In addition, the District Court instructed the jury on aiding and abetting liability, under which "[o]ne who aids and abets another is as guilty of the underlying offense as the principal," and "[t]o prove that [a defendant] aided and abetted another, the government must prove that the other, i.e., the principal . . . committed all of the elements of the offense." *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008).

Vella does not, and cannot, dispute that Rose was an "agent" of the LNPP and the City of Linden, and the Government presented significant evidence at trial showing that Rose awarded LNPP contracts in return for kickbacks from Vella while fraudulently concealing the kickbacks from the City and Union County.  Thus, because Vella aided and abetted Rose's § 666(a)(1)(A) violations, Vella did not need to be an "agent" himself, and his challenge to the sufficiency of the evidence supporting his convictions on Counts Seven and Eight fails.

V.

Vella argues next that the Government failed to disclose before trial exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), specifically the fact that Rose accepted bribes from a company called RC Construction, even though this information was revealed during the Government's case in chief.

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  We fail to see any prejudice from the Government's delayed disclosure here.  Vella argues

16

that the failure to disclose pretrial that Rose accepted bribes from RC Construction "undermined the Defense's primary argument at trial," because the defense could have "use[d] RC Construction to illustrate to the jury that all contractors doing business with Frank Rose did not have to pay him bribes." Appellant's Br. at 42-43. However, Vella himself concedes that "Rose admitted at trial to the existence of certain [other] innocent [LNPP] contractors," *id.* at 43, and so Vella was able to make his "primary argument" based on these other contractors. The existence of one more legitimate contractor could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004) (quotation marks omitted).

Moreover, "[i]f exculpatory evidence can be effectively presented at trial and the defendant is not prevented by lack of time to make needed investigation, there is no reversible prosecutorial conduct in ill-timed presentation." *United States v. Kaplan*, 554 F.2d 577, 580 (3d Cir. 1977). Here, Rose's acceptance of bribes from RC Construction was revealed during his direct examination, and defense counsel used the information in its cross-examination of Rose and in summation. Thus, a new trial would be appropriate only if Vella was "prevented by lack of time to make needed investigation." *Id.* While Vella contends that he "was deprived the benefit of an opportunity to investigate the claim about RC Construction and why the information had been withheld by Frank Rose from the Government, and by the Government from the defense," Appellant's Br. at 37, he has pointed to nothing suggesting that such an investigation would have aided the defense in any way. *See United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) ("We

17

think it unwise to infer the existence of *Brady* material based upon speculation alone.").
In light of the foregoing, Vella's *Brady* argument fails.

VI.

Finally, Vella contends that the District Court erred in admitting certain testimony from the other contractors involved in Rose's kickback scheme. "We review the District Court's evidentiary rulings for abuse of discretion." *United States v. Williams*, 458 F.3d 312, 315 (3d Cir. 2006) (citing *United States v. Versaint*, 849 F.2d 827, 831 (3d Cir. 1988)). "Under the abuse of discretion standard, an evidentiary ruling is to be reversed only if arbitrary or irrational." *Id.* (citing *United States v. Universal Rehab. Servs.*, 205 F.3d 657, 665 (3d Cir. 2000)).

At trial, Rose testified that he received kickbacks from five contractors, including Vella, in exchange for awarding them LNPP contracts. In addition, several contractors testified that they paid kickbacks to Rose to secure these contracts, and they offered their "assumptions," based on their dealings with Rose, that anyone doing business with Rose had to pay a kickback. From this evidence, the Government in summation asked the jury to conclude that Vella likewise had paid kickbacks to obtain contracts. Vella contends that the probative value of the contractors' testimony was substantially outweighed by its prejudicial effect, because it allowed the jury to infer Vella's guilt based on the acts of the other contractors and based on Vella's involvement with the LNPP.

We fail to see why this testimony, or the Government's argument based on it, was problematic. The testimony was clearly relevant, as it was probative of the existence and mode of operation of the overall scheme charged in the indictment. Also, while the

18

contractors' perception that everyone dealing with Rose was paying kickbacks was not conclusive evidence that Vella too paid kickbacks, it was certainly probative of the issue, and the jury was entitled to consider the surrounding circumstances of the overall scheme in deciding on Vella's guilt. In short, the probative value of the contractors' testimony was quite high, and the inference that the Government asked the jury to draw from it was a permissible one. Thus, Vella was not prejudiced, and the District Court surely did not abuse its discretion by admitting this testimony at trial.[5]

## VII.

In light of the foregoing, we will AFFIRM the judgment of the District Court.

---

[5] Vella argues also that the contractors' testimony was inadmissible hearsay. However, because he failed to raise a hearsay objection in the District Court, this argument is waived. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007) ("[A]bsent exceptional circumstances, issues not raised before the district court are waived on appeal.").

19