NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1518
_____

NAREE ABDULLAH,
                                          Appellant
v.

WARDEN SCI DALLAS; ATTORNEY GENERAL,
COMMONWEALTH OF PENNSYLVANIA;
DISTRICT ATTORNEY PHILADELPHIA COUNTY,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-06-cv-3885)
District Judge:  Hon. J. William Ditter
_____

Argued
November 9, 2011

Before:  SCIRICA, SMITH, and JORDAN, *Circuit Judges*.

(Filed: August 14, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Naree Abdullah, who was convicted of second-degree murder, criminal conspiracy, and three counts of robbery in the Philadelphia Court of Common Pleas, seeks habeas relief on the grounds that: (1) admission of the redacted statements of two of his co-defendants, who did not testify at trial, violated his right under the Sixth Amendment of the United States Constitution to confront the witnesses against him; (2) prosecutorial misconduct during closing argument, considered in conjunction with the admission of the redacted confessions of his co-defendants, also violated his right to confrontation; and (3) prosecutorial misconduct during closing argument, standing alone, violated his right to due process. For the following reasons, we will affirm the District Court's denial of Abdullah's habeas petition.

## I.    Background

### A.    *The Robbery And Murder At Lilly's Market*

On December 11, 1993, Abdullah, along with Jermaine Trice, Gregory Womack, Julius Jenkins, and Atil Finney drove from the Germantown area of Philadelphia to north Philadelphia in a station wagon. During the trip, they picked up Demond Jackson, who had asked Trice for a ride. When they arrived, they stopped at 33rd and Cumberland Streets, around the corner from a convenience store called Lilly's Market. Abdullah, Trice, Jenkins, and Finney then left the station wagon and entered Lilly's Market, intending to rob it.

At some point during the robbery, Jenkins shot the store owner, a gentleman named Francisco Azcona, causing him to bleed to death. After the shooting, Abdullah, Trice, Jenkins, and Finney fled the market and returned to the station wagon, carrying the

2

store's cash register. The four men, along with Womack and Jackson, then drove to Abdullah's home, where they divided the proceeds of the robbery.[1] Several days later, Police Officer Mitchell McKeever observed Jenkins approach a check cashing agency, carrying a gun, and accompanied by Womack, Trice, and Abdullah.[2] McKeever later arrested Jenkins, who was still in possession of the same .45 caliber pistol used to murder Azcona.

The police also took Womack and Finney into custody and, under interrogation, both men confessed their involvement in the Lilly's Market robbery and murder and their sharing of the proceeds from the robbery. Among other things, Womack said that he drove the conspirators to Lilly's Market, and Finney said that he entered the store with Jenkins and Abdullah.

Abdullah was arrested and charged with criminal conspiracy, murder, and robbery. The Commonwealth of Pennsylvania successfully moved, pursuant to Pennsylvania Rule of Criminal Procedure 1127, to try Finney, Abdullah, Trice, Jenkins, and Womack together. Abdullah moved to sever his trial from Jenkins's trial but that motion was denied. The joint trial of the five defendants commenced on February 25, 1996.

---

[1] Jackson, who was not a defendant in the prosecution for the Lilly's Market robbery and Azcona murder, testified that he refused to take a share of the proceeds.

[2] McKeever observed the men entering the Ace Check Cashing Agency with a .45 revolver and exiting the store two to three minutes later and getting into a station wagon. In Abdullah's trial for the robbery and murder at Lilly's Market, the presiding judge allowed the prosecution to present evidence of what turned out to be a robbery at the Ace Check Cashing Agency on December 14, for the limited purpose of proving that the defendants knew each other and had access to the firearm used to murder Azcona.

At trial, the prosecution introduced testimony from three eye-witnesses to the crime. First, Jackson testified that, on December 11, 1993, he was present in the station wagon with all of the Defendants when they drove from Germantown to Philadelphia; that he observed Abdullah enter Lilly's Market with Finney, Trice, and Jenkins; and that, after the four men returned to the station wagon with the cash register, they all went to Abdullah's residence, where the proceeds of the robbery were divided. Azcona's wife testified that three or four men entered her husband's store on the night of December 11, 1993 and that one of the men shot her husband. Finally, a man named Roach testified that he saw four men in the vicinity of Lilly's Market when the robbery occurred, that one man was carrying a cash register, and that another man was carrying a revolver.

Detective Michael Gross of the Philadelphia Police Department testified that he took a statement from Finney on March 3, 1995. Finney did not testify but Detective Gross read into evidence the following passage from a version of Finney's statement modified by redacting personal names and replacing them with references to "guys" and "someone":

> [Question]: Would you go on in your own words and tell us what happened the night Francisco Azcona was killed?
>
> [Answer]: We were riding around in this, this guy's car, me and three other guys were in … north Philadelphia. … when one said let's get paid. Everyone said okay and we saw this store. So me and two guys went in the store. When we got inside two guys stayed up front and I stayed to the back. One guy had his gun on the guy and was at the cash register. … [g]etting the money. But it wouldn't [open]. I heard a shot and looked over. Blood was coming out of the guy's mouth. After that someone grabbed the register and we all ran out.
>
> [Question]: Where did you go?

4

[Answer]: We ran to the car and went back up [to] Germantown. We went to someone's house. It's an apartment. And two guys got screwdrivers and opened up the register.

…

[Answer]: We split [the stolen money] up even.

(Supp. App. at 307 (emphasis added).) After Detective Gross read from Finney's statement, the Court gave the jury a limiting instruction telling them to consider the statement only against the individual who made it.[3]

Detective Joseph Walsh, another Philadelphia police officer, testified that he took a statement from Womack on March 7, 1995. Womack also did not testify at the trial, but Detective Walsh read into evidence the following portion of Womack's statement, which, like Finney's, had been redacted:

[Question]: Do you know who shot and killed Francisco Azcona?

[Answer]: Yes.

[Question]: What is his last name and where does he live?

---

[3] The Court instructed the jury as follows:

Members of the Jury, there is a rule of evidence that we discussed in chambers, now I'll tell you about it. The rule is that where a statement is offered at a trial concerning an alleged crime that was committed, any statement made before a trial may be considered as evidence against only as against [sic] the defendant or the person who made that statement. Thus[,] you may consider the statement as evidence only against the person who made the statement if you believe that he made a statement voluntarily. You must not consider a statement as evidence against any other defendant. You must not use the statement in any other way against any other party in the case.

(App. at 179.)

5

[Answer]: His name is blank.  He used to live on top of the bar.

…

[Question]: I want you to go on in your own words and tell me what you know about the murder of Francisco Azcona, that occurred on December the 11th, 1993.

[Answer]: It was me and another guy.  We were in the car, the other three went in the store.  The car was around the corner and then they came out of the store carrying a cash register.  As we pulled off the shooter said he shot the guy.  I think someone asked him why did he shoot the guy?  He didn't answer him.  Then we drove up our neighborhood.  Then we drove to someone's and we opened the register and got the money and we took the register and dumped it in a trash dumpster in a townhouse.

[Question]: Do you know someone's real name and where he lives?

[Answer]: I don't know his real name.  He lives somewhere on blank.

[Question]: Do you know someone else's real name and where he lives?

[Answer]: We call him blank.  I don't know where he lives.  Somewhere up dog down.

[Question]: What is someone else's real name and where does he live?

[Answer]: I don't know his real name --"

(*Id*. at 335-36.)  The trial court did not provide a limiting instruction at that point, as it had after the reading from Finney's statement.  It did, however, later give another instruction to the jury on the proper use of redacted confessions by non-testifying witnesses.

During closing argument, the prosecution referred to Womack's and Finney's redacted confessions:

6

[Prosecutor]: Now, you know also by another piece of evidence that there has been an agreement, that there was going to be a robbery, because what Atil Finney says in his statement is he agreed with the others to get paid. When he was in that car with the other people. He agreed to get paid. That's another piece of evidence that the group had planned to in fact commit this robbery … .

…

[Prosecutor]: So that's the first piece of evidence that they had that they undertook the robbery, and remember, that in Womack -- in Defendant Womack's statement he in fact said they go over to the grocery store.

(App. at 199-201.) Abdullah's attorney then objected, claiming that the prosecutor pointed and otherwise gestured towards Abdullah and the other defendants when she referred to Womack's and Finney's redacted confessions. The trial judge immediately held a sidebar conference, at which counsel for Abdullah and the other defendants argued that, by gesturing towards them, the prosecution effectively undid the redactions by indicating who was being referred to in the confessions.[4] When the sidebar concluded, the trial judge gave the following instruction to the jury:

> The United States Constitution says that anybody accused of a crime has a right to confront his accuser. That means when somebody gives a statement out of court, not under oath, not subject to cross examination, that statement is usable only against the person who made it, nobody else. So whatever evidence you think you have heard, understand that is the principle of law that must guide you that a statement is given by a person that is only usable against that person if in fact it was a voluntary, free-willed statement, which I'll explain to you later.

(*Id.* at 204.)

---

[4] Counsel for Jenkins and Trice moved for a new trial. However, the trial court denied their motions.

7

On May 13, 1996, the jury found Abdullah guilty of robbery, second degree murder, and criminal conspiracy. The trial judge sentenced him to life imprisonment for the second degree murder conviction, and a five to ten year term of imprisonment for the robbery conviction.[5]

B.    *Procedural History*

1.    *The State Court Proceedings*

On June 12, 1996, Abdullah appealed the verdict and sentence, but his appeal was dismissed because he failed to file an appellate brief. Abdullah later filed a petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541-46, seeking to reinstate his right to file a direct appeal, which was granted *nunc pro tunc*.

In his direct appeal, Abdullah argued, *inter alia*, that the trial court erred by allowing the detectives to read the portions of Womack's and Finney's redacted confessions, and that the prosecutor committed misconduct by gesturing towards him and his co-defendants while arguing that the confessions confirmed their involvement in the robbery and murder. On June 12, 2001, the Superior Court affirmed Abdullah's conviction and sentence. With respect to Abdullah's argument that the reading of the redacted confessions violated his right to confrontation, the Court noted that the incriminating effect of the confessions was "significantly limited" because "there were five co-defendants," thereby making "a direct inference difficult, if not impossible."

---

[5] Abdullah apparently received no additional penalty for the criminal conspiracy charge.

(Supp. App. at 660.) The Superior Court also highlighted the fact that the trial court "gave proper instructions as to the limited admissibility of the statement[s]." (*Id.*) With regard to Abdullah's argument that the prosecutor committed misconduct by gesturing towards him during her closing argument, the Superior Court stated:

> We do not find misconduct in this case, pursuant to the same reasoning set forth in the above argument regarding … the redacted statements. Moreover, any alleged harm was alleviated by the cautionary instructions given by the trial court on both the nature of closing arguments and the use of the co-defendants' statements. It is presumed that the jury followed these instructions.

(*Id*. at 665.) On June 26, 2001, Abdullah petitioned for *allocatur*, and, on January 9, 2002, the Pennsylvania Supreme Court denied that petition.

On July 18, 2002, Abdullah filed a *pro se* PCRA petition, claiming ineffective assistance of counsel. The PCRA Court dismissed that petition, as later amended,[6] and the Pennsylvania Superior Court affirmed. On December 21, 2005, the Pennsylvania Supreme Court denied Abdullah's petition for review.

### 2. *The Federal Habeas Proceedings*

On August 31, 2006, Abdullah filed a habeas petition in the United States District Court for the Eastern District of Pennsylvania. He alleged, *inter alia*, that: (1) the trial judge erred in admitting portions of Womack's and Finney's redacted confessions

---

[6] On April 11, 2003, Abdullah filed an amended PCRA petition which sought to introduce two affidavits by Jackson, recanting his trial testimony. On March 12, 2004, the trial court held a hearing on the Commonwealth's motion to dismiss Abdullah's amended petition. After hearing the parties' arguments, the trial court found that Jackson's recantation testimony was incredible and granted the Commonwealth's motion to dismiss.

because the confessions "were not redacted to eliminate all references to Naree Abdullah" (App. at 58); and (2) "assuming … that the statements were properly redacted, the prosecutor's closing argument nullified the redaction[s] by informing the jury that the confessions of [Finney and Womack] corroborated the theory that the robbery homicide was committed [by Abdullah]," (*id*. at 59.)  A Magistrate Judge reviewed the petition and issued a Report and Recommendation concluding that the District Court should deny Abdullah's petition without a hearing.[7]

---

[7] In rejecting Abdullah's *Bruton* claim, the Magistrate Judge stated:

> First, neither [Womack's nor Finney's] confession specifically incriminat[ed] [Abdullah] in that he is not referred to by name.  Rather, the statements were redacted so that the participants were referred to as "we," "someone," "other guy," and occasionally "blank."  Additionally, counsel for Petitioner has made no reference to additional facts or evidence linking Petitioner to the statements.  In fact, the confessions neither [allude] to nor reference Petitioner and were only introduced into evidence after cautionary instructions were given to the jury.  Accordingly, except for facially incriminating confessions, like the one in *Bruton*, the reviewing court may presume that jurors will follow the court's limiting instructions.

(App. at 31 (internal footnotes and citations omitted).)  With respect to Abdullah's prosecutorial misconduct claim, the Magistrate Judge rejected the argument that the prosecutor's actions during closing argument attempted to weaken the effect of the trial court's limiting instructions and redactions.  The Magistrate Judge reasoned that, because *Bruton* and its progeny do not address the prosecutor's conduct in Abdullah's case, "the Superior Court's adjudication cannot be contrary to Supreme Court precedent."  (App. at 34.)  Moreover, the Magistrate Judge determined that "in light of the general presumption that jurors … follow their instructions, it was reasonable for the Superior Court to conclude that the jury would follow the instructions given" by the trial court "after the prosecutor made the arguments [that are] claimed to undermine the [trial court's earlier] instructions."  (*Id.*)

On February 9, 2010, the District Court adopted and approved the Magistrate Judge's Report and Recommendation.

Abdullah timely appealed to us.

## II. Jurisdiction And Standard Of Review

The District Court had jurisdiction over Abdullah's habeas petition pursuant to 28 U.S.C. §§ 2241(a) and 2254(a). We have jurisdiction over Abdullah's appeal pursuant to 28 U.S.C. §§ 1291 and 2253. We review a district court's denial of habeas relief *de novo*. *Vega v. United States*, 493 F.3d 310, 314 (3d Cir. 2007).

We are bound by the standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), under which a federal court may not grant a writ of habeas corpus with respect to a claim that was adjudicated on the merits in state court proceedings unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Also, under the AEDPA standard, the "[s]tate court's relevant factual determinations are presumed to be correct unless the petitioner rebuts [that] presumption by clear and convincing evidence." *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)).

Since Abdullah does not assert that the state court's adjudication[8] was contrary to Supreme Court precedent, but rather contends only that the state court unreasonably applied that precedent, we focus on the "unreasonable application" prong of § 2254(d)(1).

_____

[8] The Superior Court is the highest state court to address Abdullah's constitutional claims "on the merits," and, thus, we review its June 12, 2001 decision.

11

Under that prong, to obtain habeas relief, Abdullah "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification [under existing Supreme Court precedent] that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id.* at 786 (alteration in original) (citation and internal quotation marks omitted). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." *Id.* (citation and internal quotation marks omitted). In the end, "[i]f this standard is difficult to meet, that is because it was meant to be." *Id.*

## III.    Discussion

As noted at the outset, Abdullah's habeas petition presents three questions:  (1) whether Womack's and Finney's redacted statements, in themselves, violated Abdullah's Sixth Amendment right to confrontation when they were admitted in evidence; (2) whether Womack's and Finney's redacted statements, when considered in conjunction with the prosecutor's conduct during her closing argument, constituted a violation of Abdullah's Sixth Amendment right to confrontation; and (3) whether the prosecutor's conduct during closing argument was itself a violation of Abdullah's right to due

12

process.[9] Before turning to those arguments, however, we briefly discuss the clearly established Federal law at the time the Pennsylvania Superior Court ruled on Abdullah's direct appeal.

A.    *Clearly Established Law*

When the Pennsylvania Superior Court rejected Abdullah's Sixth Amendment confrontation claim on June 12, 2001,[10] the following three cases constituted the "clearly established Federal law" from the United States Supreme Court relevant to Abdullah's confrontation claim: *Bruton v. United States*, 391 U.S. 123 (1968), *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998).

In *Bruton*, the Supreme Court considered whether it should vacate a defendant's conviction because the trial court admitted into evidence the unredacted confessions of a non-testifying co-defendant as evidence against the defendant. 391 U.S. at 123-24. The defendant, Bruton, was convicted by a jury of armed postal robbery, in violation of 18

---

[9] The certificate of appealability we granted specifically framed the questions as follows: (1) "[w]hether [Abdullah's] Sixth Amendment right to confrontation was violated with respect to his codefendants' redacted confessions, considered alone or in conjunction with the prosecutor's conduct during closing argument," and (2) "whether that conduct constituted an independent constitutional violation." (App. at 41.)

[10] In *Greene v. Palakovich*, 606 F.3d 85 (3d Cir. 2010), *aff'd sub nom. Greene v. Fisher*, 132 S.Ct. 38 (2011), we held that "the cutoff date for determining 'clearly established Federal law' for purposes of § 2254(d)(1) is the date of the relevant state-court decision." *Id.* at 99. Stated another way, "'clearly established' contemplates that the law or precedent *existed* at the time of the state court's substantive resolution of the petitioner's claim." *Id.* at 98. Because the first and last state court decision addressing the merits of Abdullah's Sixth Amendment confrontation claim was the Superior Court's decision on June 12, 2001 to affirm the judgment of conviction, that date is the cutoff for determining "clearly established Federal law" for the purposes of Abdullah's habeas petition.

13

U.S.C. § 2114. *Id.* at 124. Although Bruton's co-defendant did not testify at trial, the trial court admitted into evidence his out-of-court confessions, which inculpated Bruton. *Id.* at 124-25. The Eighth Circuit affirmed Bruton's conviction based upon its determination that the trial court properly instructed the jury to disregard the disputed confessions as evidence of Bruton's guilt or innocence because the confessions were inadmissible hearsay. *Id.* at 125. The Supreme Court reversed, holding that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," the admission of the disputed confession "violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126.

In reaching that holding, the Court acknowledged that in many circumstances a reviewing court may presume that "the jury can and will follow the trial judge's instructions to disregard [inadmissible hearsay]," but the Court noted that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. In those situations, the Court reasoned, "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant," may be "devastating to the defendant." *Id.* at 135-36.

In *Richardson*, the Supreme Court considered whether the admission of a non-testifying co-defendant's confession, which was redacted to omit any reference to the defendant, violated the defendant's confrontation right. 481 U.S. at 202. In that case,

14

Clarissa Marsh, Benjamin Williams, and Kareem Martin were tried together for assaulting Cynthia Knighton and murdering her four-year old son. *Id.* During the trial, Williams did not testify. *Id.* at 204. However, the government introduced a confession Williams gave to the police shortly after his arrest. *Id.* at 203. Although the confession "was redacted to omit all reference to [Marsh]-indeed, to omit all indication that *anyone* other than Martin and Williams participated in the crime," *id.*, Marsh later testified that Williams and Martin had discussed the murder in the front seat of a car on the way to Knighton's residence, and that Marsh was in the back seat of the car during that discussion. *Id.* at 203-04.

During its closing argument, the trial judge instructed the jury that it could not consider Williams's confession in determining whether Marsh was guilty. *Id.* at 205. The jury convicted Marsh of two counts of felony murder and one count of assault with intent to commit murder. *Id.* After the state courts affirmed Marsh's conviction, she filed a habeas petition, alleging that the introduction of Williams's confession violated her right to confrontation under the Sixth Amendment. *Id.* The district court denied Marsh's petition, but the Sixth Circuit Court of Appeals reversed. *Id.* at 206.

On appeal, the Supreme Court held that "the Confrontation Clause is not violated by the admission of a non[-]testifying codefendant's confession with a proper limiting instruction when … the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. In reaching that holding, the Court explained that a defendant is deprived of the right of confrontation where, as in *Bruton*, "the codefendant's confession expressly implicate[s] the defendant as his

15

accomplice." *Id.* at 208 (citation and internal quotation marks omitted).  Under those conditions, the Court noted, there is "not the slightest doubt" that the codefendant's confession will prove "powerfully incriminating."  *Id.* (quoting *Bruton*, 391 U.S. at 135). In other cases, the Court noted that a codefendant's confession may not be "incriminating on its face," and "[becomes] so only when linked with evidence introduced later at trial … ."  *Id.*  In such cases, or, as the Court put it, when confessions are "incriminating by connection," the Court said that "the [trial] judge's [limiting] instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget," and that "while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*[]."  *Id.* at 208-09.  In deciding the merits of Marsh's appeal, the Supreme Court made clear that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."  *Id.* at 211 n.5.

*Gray* answered at least one of the questions left open after *Richardson*:  whether a redacted codefendant's confession, which substitutes a blank or symbol for the defendant's name violates the Confrontation Clause.  *Gray*, 523 U.S. at 188.  In that case, Anthony Bell, Kevin Gray, and Jacquin Vanlandingham participated in the beating of Stacey Williams that eventually led to his death.  *Id.* at 188.  Because Vanlandingham died before the trial, Bell and Gray were the only individuals indicted and tried for the murder.  *Id.*  Although Bell did not testify at trial, the trial judge allowed the government

16

to introduce a redacted version of his confession into evidence. *Id.* Thus, a police detective read Bell's confession to the jury, using the word "deleted" or "deletion" each time Gray's name or Vanlandingham's name appeared in the transcript. *Id.* After the detective read the confession to the jury, the prosecutor asked the detective, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct," and the detective responded affirmatively. *Id.* at 188-89. The State also introduced into evidence a written version of Bell's confession with blank white spaces where Gray and Vanlandingham's names appeared in the text.[11] *Id.* at 189. The trial judge instructed the jury that Bell's confession could only be used as evidence against him, and that the jury should not use Bell's confession as evidence against Gray. *Id.* At the conclusion of the trial, the jury convicted both Bell and Gray of murder. *Id.* Gray appealed. *Id.*

On appeal, the Supreme Court held that Bell's confession, "which substituted blanks and the word 'delete' for [Gray's] proper name, falls within the class of statements to which *Bruton*'s protections apply." *Id.* at 197. In reaching that conclusion, the Court reasoned that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration … leave statements that … so closely resemble *Bruton*'s unredacted statements that" they also violate a defendant's right to confront the witnesses against him. *Id.* at 192. The

---

[11] The Supreme Court provided the following excerpt of what the witness who read Bell's confession told the jury: "Question: Who was in the group that beat Stacey? Answer: Me, deleted, deleted, and a few other guys." *Gray*, 523 U.S. at 196.

17

Court went on to say that, in those situations, "[a] juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to [the defendant], sitting at counsel table," to determine the obvious answer. *Id.* at 193. The Court further explained that a "blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to … a testifying codefendant's accusatory finger." *Id.* at 194.

The Gray court also said that "in some instances[,] the person to whom the blank [in the disputed statement] refers may not be clear[,][such as] … cases in which a confession … uses two (or more) blanks, even though only one other defendant appears at trial, and in which the trial indicates that there are more participants than the confession has named." *Gray*, 523 U.S. at 194-95. Thus, while the "followup question … the State [asked the detective] … eliminated all doubt" *id.* at 194, as to whether the disputed redactions in *Gray* referred to the defendant, it seemed that the Court was prepared to say that not every statement that contains an "obvious indication of deletion" *id.* at 192, runs afoul of *Bruton*. But instead, the Court added this conclusion, "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Id.* at 195.

In sum, read together,

> [w]hat [*Bruton*, *Richardson*, and *Gray*] underscore is that the nature of the linkage between the redacted statement and the other evidence in the record is vitally important in

18

> determining whether a defendant's Confrontation Clause right has been violated. Even redacted statements will present Confrontation Clause problems unless the redactions are so thorough that the statement must be linked to other evidence before it can incriminate the co-defendant.

*United States v. Hardwick*, 544 F.3d 565, 573 (3d Cir. 2008). In other words, those cases instruct that a trial court must assess the strength of the inference that a jury may draw from the redacted testimony of a non-testifying co-defendant by considering that testimony along with other evidence presented during trial to determine whether admission of the redacted testimony violates *Bruton*. When disputed redactions or deletions are "obvious" and give rise to an immediate inference that the non-testifying witness's confession refers to the defendant, as was the case in *Gray*, the redactions or deletions violate *Bruton*. On the other hand, where a non-testifying witness's statement is "incriminating by connection," *Richardson*, 481 U.S. at 208 (*i.e.*, the "[non-testifying witness's statement] [i]s not incriminating on its face," and "[becomes] so only when linked with evidence introduced later at trial," *id.*), or, where other evidence presented during trial substantially weakens any inference the jury could draw from the contested statement, *Gray*, 523 U.S. at 195, there is no *Bruton* violation.[12]

---

[12] Our dissenting colleague sees things differently. Under the Dissent's interpretation of *Gray*, *any* obvious deletion or redaction in the statement of a nontestifying codefendant (read to the jury during trial) violates *Bruton*, irrespective of whether that deletion or redaction gives rise to the immediate inference that the defendant is guilty of the crimes charged in the indictment. (*See* Dissent at 5 (noting that *Gray* court held that "the use of obvious redactions as a substitute for codefendant names is impermissible under *Bruton even where those redactions do not clearly refer to a particular defendant*, such as where the confession uses two or more blanks even though only one other defendant is on trial or whether the trial indicates that there are more participants than the confession has named." (emphasis added)).) However, if the

B.        *The Admission of Womack's and Finney's Redacted Confessions*

Here, although the admission of Womack's and Finney's redacted confessions raises legitimate constitutional concerns, we are not persuaded that the Superior Court's ruling with respect to Abdullah's confrontation claim is "so lacking in justification" under clearly established Supreme Court precedent that it constitutes an error that is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

We readily acknowledge that this case bears a resemblance to *Gray* and raises some of the same concerns expressed there. Evidence adduced during trial suggested that six individuals drove to Lilly's Market in a station wagon and divided the proceeds of the robbery at Abdullah's house in Germantown. In particular, Jackson testified that six individuals were together on the trip to Lilly's Market, where the robbery and murder occurred. Because Jackson did not stand trial for the robbery of Lilly's Market and the murder of Azcona, there is an argument that, despite the redactions, the jury could readily infer that the five defendants who stood trial were the other five individuals present during the robbery and murder.

Supreme Court meant to say that any deletion in any context is necessarily a *Bruton* violation, then there would be significant tension between *Gray* and *Richardson*, since a deletion referring to a single person in a case with several defendants cannot, in itself, be immediately inculpatory. Indeed, the Dissent's interpretation of *Gray* suggests that *Gray* constitutes a *sub silentio* overruling of *Richardson*, notwithstanding language in *Gray* to the contrary. *See Gray*, 523 U.S. at 195 ("We … concede that *Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially … ."), *and id.* at 196 ("*Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference … .").

20

However, any such inference that the jury could draw from Jackson's testimony combined with Womack's and Finney's redacted confessions is weakened by inconsistencies between each confession and other evidence that was presented to the jury. *See Hardwick*, 544 F.3d at 573 (noting that *Bruton*, *Richardson*, and *Gray* underscore "that the nature of the linkage between the redacted statement and *the other evidence in the record* is vitally important in determining whether a defendant's Confrontation Clause right has been violated" (emphasis added)); *United States v. Schwartz*, 541 F.3d 1331, 1351 (11th Cir. 2008) (noting that under the principles articulated in *Bruton*, *Richardson*, and *Gray*, "[a] defendant's confrontation right is violated when the court admits a codefendant statement that, *in light of the Government's whole case*, compels a reasonable person to infer a defendant's guilt" (footnote omitted) (emphasis added)). The redacted confessions and Jackson's testimony provided conflicting accounts of the number of individuals present when the robbery and murder occurred. When asked to describe what happened on December 11, 1993, Womack stated that five individuals were riding in a car and three of those individuals left the car to rob Lilly's Market: "[i]t was me and another guy. We were in the car, the other three went in the store." (Supp. App. at 335.) By contrast, when asked "what happened the night … Azcona was killed," Finney's response indicated that only four individuals were in the car: "[w]e were riding around in this … guy's car, me and three other guys were in … north Philadelphia." (*Id*. at 307.) Finney later gave conflicting testimony, saying that six individuals were involved. Further complicating the evidence, Mrs. Azcona was unsure whether there were three or four robbers in the store when her husband was shot.

21

The conflicting statements from Jackson, Finney, and Womack, along with Mrs.

Azcona's testimony, cast doubt upon the number of individuals present at the scene of the

crime and, correspondingly, upon the assertion that Womack's and Finney's redacted

confessions gave rise to an immediate inference that Abdullah was among the individuals

who robbed Lilly's Market and murdered Azcona. [13] *See Gray*, 523 U.S. at 195

(explaining that redacted confession may not violate *Bruton* where "the trial indicates that

there are more participants than the [redacted] confession has named"). In short,

Womack's and Finney's redacted confessions, considered in conjunction with the other

evidence presented by the government, arguably prevented a direct inference of

Abdullah's guilt from the confessions. [14]

---

[13] For example, if, as Womack's redacted confession suggests, five individuals drove to Lilly's Market in the station wagon – and two of them were, based on Jackson's testimony, Womack and Jackson – then the jury could not immediately infer that Abdullah was one of the other three individuals present in the station wagon, because Abdullah was one of four defendants (other than Womack) standing trial for the robbery and murder. Likewise, if, as Finney's redacted confession suggests at one point, only four individuals drove to Lilly's Market in the station wagon – and two of them were, based on Jackson's testimony, Finney and Jackson – then the jury could not immediately infer that Abdullah was one of the other two individuals in the station wagon because he was one of four defendants (other than Finney) standing trial for the robbery and murder.

**Error! Main Document Only.**

[14] Consistent with our dissenting colleague's interpretation of *Gray*, he argues that, because Womack's and Finney's redacted confessions contain some obvious alterations, that fact alone compels us to grant the writ. The standard of review we operate under on habeas review requires us to disagree. It is not our duty to determine whether we would decide the matter in dispute differently if this case were before us on direct review. We are, rather, to determine whether the highest state court that reached the merits of the petitioner's claim made an error that is so egregious that it is beyond the possibility of fair-minded disagreement. In other words, we must decide whether any rational jurist could conclude that, under existing Supreme Court precedent, the petitioner is not entitled to habeas relief. Perhaps this exacting standard is why at least one jurist has said that

22

Given the similarities between this case and *Gray*, the trial court would have been well-advised to require further redactions or to keep the confessions out altogether, since it was trying the defendants in a group. Nevertheless, we cannot say that the Superior Court's decision to reject Abdullah's confrontation claim constituted "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

"[s]uccess in obtaining relief under 28 U.S.C. § 2254 sometimes seems just as difficult as the rich man's quest to enter the Kingdom of Heaven, compared in the Bible to a camel's passing through the eye of a needle." *Overstreet v. Wilson*, --- F.3d ---, 2012 WL 2819296, at *5 (7th Cir. July 11, 2012) (Wood, J., dissenting).

Under that standard of review, we do not believe that *Gray* must be read as entirely undermining *Richardson*. While we acknowledge that *Gray* says that, "considered as a class, redactions that replace a proper name with an obvious blank … or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant" the same legal treatment, 523 U.S. at 194-95, *Gray* also says that redacted statements that incriminate only inferentially are beyond the scope of *Bruton*'s rule. *Id.* at 195. It is thus within fair-minded dispute to understand *Gray* as modifying but not eliminating *Richardson*'s rule that redactions must lead to a direct inference of guilt before they can be said to violate the rule enunciated in *Bruton*. In other words, one need not see *Gray* as laying down the black and white rule asserted by the Dissent.

If one believes that *Richardson* is not so starkly limited by *Gray*, and if one further accepts, as the Pennsylvania Superior Court evidently did, **Error! Main Document Only.**the possibility that an obvious blank in a redacted confession may give rise to an inference of guilt that is less than immediate, then the mere existence of obvious blanks does not, by itself, lead to the conclusion that there was a *Bruton* violation. As long as the deletions do not give rise to a direct and immediate inference that the petitioner is the person referred to in the blanks, the Sixth Amendment is satisfied. **Error! Main Document Only.***Cf. Priester v. Vaughn*, 382 F.3d 394, 401 (3d Cir. 2004) (holding that, in a case involving "at least fifteen perpetrators," and in which a co-defendant's statement was redacted by replacing names with phrases such as "the other guy" or "another guy," the changes to the statement were "bereft of any innuendo that tie[d] them unavoidably to [the defendant].") That is arguably the case here, where the redacted confessions give such inconsistent accounts of the events that transpired on the night of the crime that the jury is incapable of drawing an immediate inference of the petitioner's guilt based on those confessions alone.

23

C.    *The Prosecutor's Conduct During Closing Argument*

We also reject in short order Abdullah's argument that the admission of Womack's and Finney's redacted confessions, when considered in conjunction with the prosecutor's conduct during closing argument, violated his right to confrontation and, his assertion that the prosecutor's conduct during closing argument was itself a violation of Abdullah's right to due process. "Under the statutory standards governing the granting of habeas relief, a state court's factual findings must be rebutted by clear and convincing evidence." *Washington v. Sobina*, 509 F.3d 613, 621 (3d Cir. 2007). Those statutory standards, of course, presume that a state court makes a finding of fact in the first instance. Where a petitioner fails to develop a factual record supporting his claim for habeas relief, a district court may not hold an evidentiary hearing unless the applicant demonstrates that the claim relies on: (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicate that could not have been previously discovered through the exercise of due diligence"; and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)-(B).

Abdullah's allegation that the prosecutor exacerbated the *Bruton* problem created by the admission of Womack's and Finney's redacted confessions by "gesturing" toward him during her closing argument, and his claim that the prosecutor's conduct – *i.e.*, the gesturing – was itself a violation of his right to due process, do not provide a basis upon

24

which we may grant his petition for habeas relief because Abdullah failed to create a factual record sufficient to support those claims. Although defense counsel argued during trial that the prosecutor improperly pointed or gestured towards Abdullah while referring to Womack's and Finney's redacted confessions, the trial court made no fact findings on that issue. Specifically, when defense counsel told the prosecutor "[y]ou're pointing and gesturing towards the Defendant," and moved for a mistrial, the trial court neither confirmed nor denied that assertion, but instead said "I understand your argument and I understand the District Attorney's point of view, and the way to handle it is do you want a curative [instruction] now or do you want me to just pass it by and charge the jury that it's to be used only against the person making it?" (App. at 202-03.) Aside from defense counsel's accusatory statement (which, of course, does not constitute evidence), there is no evidentiary basis upon which we may determine whether the prosecutor actually pointed or gestured toward Abdullah during her closing argument, and, in doing so, violated Abdullah's right to confrontation or due process. And because Abdullah did not argue before the District Court that he is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2), and the record does not indicate that he is entitled to one, we cannot assess the strength of his constitutional claims. Therefore, the allegations concerning the prosecutor's conduct during closing argument do not, either alone or in combination with the redacted confessions, support Abdullah's petition for habeas relief.[15]

---

[15] Abdullah also argues that the prosecutor violated his right to due process by "ratcheting up her unfair closing argument by actually naming Abdullah" as one of the individuals described in Finney's confession. (Appellant's Br. at 39.) In making that argument, he refers to the following passage:

> Prosecutor: Mr. Jackson tells you that they go back to Germantown to Abdullah's house. Well, Finney in his statement says that after he goes to the grocery store and comes out, he said he gets into a car and goes to Germantown. So is Mr. Jackson lying about that? And as a matter of fact they take the expressway and that's the way you get back to Germantown. Fern Hill Park is right off the expressway and that's on the way to Germantown. So let's see is he wrong about that?
>
> Now, he tells you that they go to Mr. Abdullah's house. Well, they go to someone's house in Germantown. Mr. Finney tells you he goes to a house in Germantown and gets some money. Mr. Womack says he gets some money when he goes to someone else's house.

That statement does not support Abdullah's claim for habeas relief because it does not violate Abdullah's right to due process. In order to "constitute a due process violation, [a prosecutor's] misconduct must be of sufficient significance to result in the denial of a defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987). To determine whether a prosecutor's conduct violates a defendant's right to a fair trial, we examine: (1) "the curative instructions, if any, given by the trial court"; (2) "the weight of the properly admitted evidence against the defendant"; and (3) "the prosecutor's improper actions." *United States v. Liburd*, 607 F.3d 339, 344 (3d Cir. 2010) (citing *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008).) As noted, the trial court gave the jury an appropriate curative instruction. The weight of the evidence can be argued either way, but there is untainted testimony in the record that supports Abdullah's guilt: (1) Jackson's testimony that Abdullah accompanied his co-defendants to Lilly's Market and took part in the robbery and murder; (2) Jackson's testimony that Abdullah and his co-defendants drove to Abdullah's house and split the proceeds of the robbery; and (3) Roach's testimony that he observed four men walking down the street in the vicinity of Lilly's Market at the time of the robbery, and that one of the men was carrying a cash register. And the prosecutor's statement itself does not violate *Bruton* because it only encourages the jury to infer that Abdullah was involved in the robbery and murder based on Jackson's testimony. Although the prosecutor used Finney's and Womack's statements to prove that the robbers retreated to a house in Germantown, the prosecutor did not say that either Womack's or Finney's redacted statements referred to Abdullah. Thus, Abdullah is not entitled to habeas relief based on his prosecutorial misconduct claim.

**IV.    Conclusion**

For the foregoing reasons, we will affirm the District Court's denial of Abdullah's petition for habeas relief.

*Naree Abdullah v. Warden SCI Dallas*, No. 10-1518 (Draft Dissent)

SMITH, *Circuit Judge*, dissenting.

I agree that the majority has employed the correct legal standard in their determination that *Bruton v. United States*, 391 U.S. 123 (1968), *Richardson v. Marsh*, 481 U.S. 200 (1987) and *Gray v. Maryland*, 523 U.S. 185 (1998) were "clearly established federal law" when the Pennsylvania Superior Court (the "Superior Court") rejected Naree Abdullah's Sixth Amendment confrontation claim on direct appeal.[1] However, I disagree with my colleagues in their legal analysis — most notably, their determination that the Superior Court did not unreasonably apply the *Bruton* line of cases (*Gray* in particular) in violation of Abdullah's Sixth Amendment rights. Because I do not view this error as harmless, I would grant Abdullah's petition for habeas relief.

I

I supplement the majority's recitation of the facts in several respects.

As set forth in the majority opinion, a joint trial of five codefendants — Abdullah, Eric Greene (a/k/a Jermaine Trice), Gregory Womack, Julius Jenkins, and Atil Finney — was held related to the 1993 robbery and murder at Lilly's Market in north Philadelphia.

---

[1] In *Greene v. Palakovich*, we decided that Greene, one of Abdullah's codefendants, could not rely on *Gray* because *Gray* was not clearly established law under AEDPA at the time that Greene's relevant state-court decision was issued. 606 F.3d 85, 95, 99 (3d Cir. 2010), *aff'd sub nom. Greene v. Fisher*, 132 S. Ct. 38 (2011). That is, the Supreme Court did not issue *Gray* until after the Superior Court's decision on Greene's direct appeal.

In Abdullah's case, however, *Gray* was clearly established law under AEDPA at the time of Abdullah's relevant state-court decision. The Supreme Court issued *Gray* on March 9, 1998, prior to the Pennsylvania Superior Court's June 12, 2001 decision on Abdullah's direct appeal. Consequently, *Gray* is applicable to the instant matter.

1

Neither Finney nor Womack testified at trial. Nonetheless, the Commonwealth sought to introduce statements by Finney and Womack regarding the robbery and murder at Lilly's Market. Those statements were redacted to omit references to the names of any of their co-defendants (collectively, the "Redacted Statements").

Detective Michael Gross of the Philadelphia Police Department read Finney's redacted statement into the record. When Detective Gross reached a portion of the redacted statement where Finney was asked to identify the full names of the individuals who participated in the robbery and murder, the redaction simply deleted the names or changed the names to the word "blank." The redacted statement read into the record at trial included:

QUESTION: Do you know any of these guys by their full names?

ANSWER: One is and the other is. I only know two of them by their nicknames.

\*　　　\*　　　\*

QUESTION: Detective Worrell is going to show you some photos. Tell us if you recognize anyone.

ANSWER: Number three is. Number six is. Number eight is.

QUESTION: Do you know a guy named blank?

ANSWER: I know a blank.

QUESTION: Can you identify this picture?

ANSWER: Yes. That's him.

Identified photo number of photo of blank.

Finney's redacted statement also replaced the names of certain individuals with the word

2

"blank" on four other occasions.

Detective Joseph Walsh of the Philadelphia Police Department read Womack's redacted statement into the record. This redacted statement also replaced names of individuals identified by Womack with the word "blank" and "someone." This redacted statement included the following:

QUESTION: Do you know who shot and killed Francisco Azcona?

ANSWER: Yes.

QUESTION: What is his last name and where does he live?

ANSWER: His name is blank. He used to live on top of the bar.

\* \* \*

QUESTION: Do you know someone's real name and where he lives?

ANSWER: I don't know his real name. He lives somewhere on blank.

QUESTION: Do you know someone else's real name and where he lives?

ANSWER: We call him blank. I don't know where he lives. Somewhere in dog down [sic].

QUESTION: What is someone else's real name and where does he live?

ANSWER: I don't know his real name, but when we were locked up he used blank.

3

II.

A.

Federal habeas relief may be granted pursuant to 28 U.S.C. § 2254(d) where the state court's decision "involved an unreasonable application of" clearly established federal law as determined by the Supreme Court. When determining whether a state court's application of federal law was *unreasonable* under § 2254(d), the "state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). In my view, the Superior Court unreasonably applied the *Bruton* line of cases, most notably *Gray*.

In *Gray*, three men — Anthony Bell, Kevin Gray, and Jacquin Vanlandingham — allegedly participated in the fatal beating of the victim. *See Gray*, 523 U.S. at 188. Bell confessed to the crime, and in that confession he implicated both Gray and Vanlandingham. *See id.* Vanlandingham died prior to trial. *See id.* Bell and Gray were tried jointly, and Bell did not testify. *See, e.g.*, *id.* at 188-89. The trial court permitted Bell's confession to be read into evidence on the condition that it was redacted to remove the names of both Gray and Vanlandingham. *See id.* 188. A police detective read the confession into evidence, replacing the names of Gray and Vanlandingham with the word "deleted" or "deletion." *See id.* For example, a portion of the redacted statement at issue in *Gray* read: "Question: Who was in the group that beat Stacey[.] Answer: Me, deleted, deleted, and a few other guys." *Id.* at 197. The Supreme Court held that such redactions

4

violated *Bruton* because they were "obvious indications of alteration" that "leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." *See id.* at 192.

In so holding, the Supreme Court noted that "a jury will often react similarly to an unredacted confession and a confession redacted [by obvious alterations] for the jury will often realize that the confession refers specifically to the defendant." *See id.* at 193. The Court stated that "this is true even when the State does not blatantly link the defendant to the deleted name" because obvious deletions may overemphasize the importance of the confession's accusation, call the juror's attention to the removed name, and encourage the jury to speculate about the reference. *Id.* The Court further noted that the use of obvious redactions as a substitute for codefendant names is impermissible under *Bruton* even where those redactions do not clearly refer to a particular defendant, such as where the confession uses two or more blanks even though only one other defendant is on trial or where the trial indicates that there are more participants than the confession has named. *Id.* at 194-95.

Here, the Redacted Statements that were read into the record at trial contained obvious redactions of names, including the use of deletions and the word "blank." Thus, it is clear that the Redacted Statements fall squarely within the class of statements protected by *Gray* and *Bruton*. *See, e.g.*, *Gray*, 523 U.S. at 197.

The majority concludes that "[t]he conflicting statements from [Demond] Jackson, Finney, and Womack, along with Mrs. Azcona's testimony, cast doubt upon the number of individuals present at the scene of the crime and, correspondingly, upon the assertion

5

that Womack's and Finney's redacted confessions gave rise to an immediate inference that Abdullah was among the individuals who robbed Lilly's Market and murdered Azcona." *Gray*'s plain language, however, is at odds with the majority's conclusion:

> We concede certain differences between *Bruton* and this case. A confession that uses a blank or the word "delete" (or, for that matter, a first name or a nickname) less obviously refers to the defendant than a confession that uses the defendant's full and proper name. Moreover, in some instances the person to whom the blank refers may not be clear: Although the followup question asked by the State in this case eliminated all doubt, the reference might not be transparent in other cases in which a confession, like the present confession, uses two (or more) blanks, even though only one other defendant appears at trial, and in which the trial indicates that there are more participants than the confession has named. *Nonetheless, as we have said, we believe that, considered as a class, redactions that replace a proper name with an obvious blank, the word "delete," a symbol, or similarly notify the jury that a name has been deleted are similar enough to* Bruton*'s unredacted confessions as to warrant the same legal results*.

*Gray*, 523 U.S. at 194-95 (emphasis added).[2]

The majority has also overlooked the inherently speculative danger caused by obvious redactions. For instance, in Finney's statement, the detective laid a photo array before Finney and asked him to identify the individuals. Finney then identified four of the individuals depicted in the array, and the trial court redacted the statement to delete

---

[2] To the extent the majority relies on *Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004) for the proposition that the Sixth Amendment is satisfied "[a]s long as the deletions do not give rise to a direct and immediate inference that the petitioner is the person referred to in the blanks," I view that case as inapposite. It did not involve obvious deletions of names from a non-testifying codefendant's statement. *See id.* at 400-01 (redacting a codefendant's statement by replacing names with generic phrases such as "the other guy" or "another guy"). In fact, *Priester* expressly stated that its circumstances do not implicate the concerns discussed in *Gray*, such as that "'an obvious blank will not likely fool anyone,' 'the obvious deletion may well call the jurors' attention specially to the

6

three of the names and substituted the word "blank" for the fourth name. The jury's likely natural and immediate inference upon hearing Finney's redacted statement was that Finney identified his four codefendants. However, Finney's unredacted statement demonstrates that Finney identified only some of his codefendants in the photo array. In particular, Finney named "Quad" (a/k/a Greene), "Man" (a/k/a Womack), and two other non-codefendants. That Finney did not name Abdullah in the photo array is beside the point because the natural inference to be drawn was that Abdullah's name was likely among those redacted. Despite this, Abdullah could not confront Finney at trial, and thus, Abdullah's Sixth Amendment rights were violated.[3]

Moreover, contrary to the majority's assertion, I am not suggesting that *Gray sub silentio* overruled *Richardson*. As *Gray* acknowledges, "*Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially," and that the jury "must use inference to connect the statement in [a] redacted confession with the defendant." *Id.* at 195. However, *Gray* went on to state that just because a jury must

---

removed name,' and that 'a blank or some other similarly obvious alteration' are 'directly accusatory[.]'" *Id.* at 400 (quoting *Gray*, 523 U.S. at 193-94).

draw an inference does not mean that the statement falls within *Richardson*.  *See id.*

Otherwise, *Richardson* would also place outside *Bruton*'s scope confessions that used

shortened first names, nicknames, unique descriptions, and perhaps even a defendant's

full name if that defendant is generally known by a nickname.  *See id.*  Thus, *Gray*

reasoned that

> *Richardson* must depend in significant part upon the *kind* of, not the simple
> *fact* of, inference.  *Richardson*'s inferences involved statements that did not
> refer directly to the defendant himself and which became incriminating
> only when linked with evidence introduced later at trial.  The inferences at
> issue here involve statements that, despite redaction, obviously refer
> directly to someone, often obviously the defendant, and which involve
> inferences that a jury ordinarily could make immediately, even were the
> confession the very first item introduced at trial.

*Id.* at 196 (quotation marks and citations omitted).  *Gray* continued, noting that because a

jury can draw immediate inferences, a "redacted confession with the blank prominent on

its face, in *Richardson*'s words, '*facially incriminat[es]*' the codefendant."  *Id.* (emphasis

added).  In other words, *Gray* does not purport to overrule *Richardson*, and I do not

suggest otherwise; instead, *Gray* expressly acknowledges that its circumstances — i.e.,

---

[3] Similarly, I am not persuaded by the Commonwealth's argument that the Redacted
Statements were too confusing for the jury to deduce the identity of the named
confederates.  The Commonwealth asserts that the "large number of codefendants and
conspirators made it far too difficult to keep track of each assailant, particularly where
the redactions suggested that the confederates included individuals other than those on
trial."  For instance, the Commonwealth argues that Finney's redacted statement replaced
five individuals' names with "blanks" but that only four codefendants were on trial.  The
Superior Court found this line of argument persuasive.  *Gray*, however, contradicts the
Commonwealth's argument because there the Supreme Court held that the class of
statements that replace a name with an obvious redaction violate *Bruton* regardless of
whether a clear link can be drawn between the redacted name and any particular
codefendant.  *See Gray*, 523 U.S. at 194-95.

8

the introduction of a nontestifying defendant's statement that contains obvious redactions — is a different kind of inference than what was at issue in *Richardson* and that such statements facially incriminate codefendants. Thus, much as *Gray* expressly found that *Richardson* did not control the result there, *id.* at 195, it likewise does not control the result here.

In sum, the Superior Court's decision — by ignoring the express, unequivocal language in *Gray* as discussed *supra* — was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. Accordingly, I conclude that the Superior Court unreasonably applied the *Bruton* line of cases, particularly *Gray*.

## B.

I am also not persuaded by the Commonwealth's argument that the introductions of the improperly redacted statements by Finney and Womack were harmless. In a harmless error analysis, we examine whether the alleged constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted); *see Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that the *Brecht* standard applies to all constitutional errors by a state court under collateral review).

Here, Jackson, who was the Commonwealth's star eyewitness, testified that: he was present in the station wagon with Defendants on the night of the robbery; he observed Abdullah, Finney, Greene, and Jenkins enter Lilly's Market; Defendants returned to the car with the cash register; and they all went to Abdullah's house where

9

Defendants divided the robbery's proceeds. However, Jackson's credibility was highly questionable. At the time that Jackson gave his initial statement to the police implicating Defendants in the robbery, Jackson himself was a target of the robbery investigation, and thus had every incentive to point the finger of blame in another direction. Ultimately, despite Jackson's presence both in Womack's car during the robbery and at the location where Defendants divided the stolen money, the Commonwealth did not charge Jackson for any crimes associated with the robbery.

Further, Jackson was facing three pending state drug charges — two charges for possession and one for possession with intent to distribute — at the time he testified against Abdullah. Jackson may have hoped to ingratiate himself with the Commonwealth and obtain leniency as to his pending drug charges by testifying against Defendants. Finally, Jackson's testimony included several significant discrepancies compared to an earlier statement he gave to the police. For example, contrary to his earlier statement that Abdullah carried the cash register from Lilly's Market, Jackson testified that Greene took the cash register from the store. Jackson also testified that all of the occupants of the station wagon, except for him and Womack, entered the store. This directly contradicted his earlier statement that Greene remained in the car with him and Womack. In short, Jackson's eyewitness testimony was highly suspect.[4]

Moreover, Fancisco Azcona's wife and Keenan Roach were the only other

10

eyewitnesses who were offered by the Commonwealth against Abdullah. Azcona's wife testified that, on December 11, 1993, three or four men entered Lilly's Market, robbed the store, and one of the men shot and killed her husband. Roach testified that, at the time of the robbery, he saw four men in the vicinity of Lilly's Market and that one man was carrying a cash register while another man was holding a revolver. Neither of these eyewitnesses, however, could identify Abdullah or any of the other Defendants as perpetrators of the robbery.

In addition to the eyewitness testimony, the Commonwealth also introduced the testimony of Police Officer Mitchell McKeever. McKeever testified that on December 14, 1993, a few days after the robbery and murder at Lilly's Market, he witnessed Jenkins, Womack, Greene, and Abdullah walking near 29th and York Street in Philadelphia. McKeever testified that Jenkins was carrying a handgun and that the four men entered Ace Check Cashing Agency ("Ace"). After a few minutes, McKeever saw the men exit Ace and walk to a station wagon. McKeever testified that he arrested Jenkins and recovered the handgun. Officer John Finor, an expert in firearms identification, testified that the handgun fired the bullet recovered from the scene of Mr. Azcona's murder. Even if, as the majority asserts, this testimony evidences Abdullah's relationship to the other codefendants and their access to the murder weapon, this after-the-fact evidence offered to show that Abdullah participated in the Lilly's Market robbery

---

[4] The Commonwealth counters that because the jury convicted Defendants, it must have found Jackson credible. I fail to see how it is possible to determine whether the jury found Jackson credible. It is quite possible the jury found Jackson credible only in light

11

is, at best, highly circumstantial.

The Commonwealth presented no fingerprints or other physical evidence linking Abdullah to the crime scene. Other than Jackson's suspect testimony, the only direct pieces of evidence tying Abdullah to the robbery were the Redacted Statements, which were improperly admitted into evidence against Abdullah. Given the lack of physical evidence tying Abdullah to the crime scene, Jackson's credibility issues, the inability of the other eyewitnesses to identify Abdullah, and the circumstantial nature of McKeever's testimony — the Commonwealth's case against Abdullah was shaky. In fact, the Redacted Statements may well have been the most damning pieces of evidence the Commonwealth introduced against Abdullah. *See, e.g.*, *Bruton*, 391 U.S. at 135 (recognizing that the statements of a non-testifying codefendant that incriminate the defendant are so powerful and devastating to the defendant that not even limiting instructions, and the attendant presumption that the jury follows those instructions, can overcome the violation). Thus, the introduction of the Redacted Statements could only have had a substantial and injurious effect on the jury's decision to convict Abdullah.

I simply do not see how the erroneous admission of the Redacted Statements against Abdullah can be viewed as harmless.

### III.

For the reasons set forth above, I would grant Abdullah's petition for habeas relief. I respectfully dissent.

---

of the Redacted Statements. It is also possible that the jury did not find Jackson credible at all and relied solely on the Redacted Statements.

12